Frederick Investment Co. et al. *v*. American
Surety Co. of New York, Appellant.

Argued October 10, 1933.   Before Frazer, C. J., Simpson, Kephart, Schaffer, Maxey and Drew, JJ.

*E. W. Arthur,* with him *James M. Magee,* for appellant.

*Frederic W. Miller,* with him *Ferd H. Phillips,* for appellees.

Opinion by Mr. Justice Drew, November 27, 1933:

This is an action of assumpsit upon a surety bond issued by the defendant company in 1926, wherein the defendant bound itself, as surety, to pay to the plaintiffs, a corporation engaged in the business of selling musical instruments and its affiliated finance company, "such pecuniary loss as the latter shall have sustained of

money or other personal property......by any act or acts of Fraud, Dishonesty, Forgery, Theft, Embezzlement, Wrongful Abstraction or Wilful Misapplication, ......on the part of any of the employees named in the schedule attached to and hereby made a part of this bond, while in any position or at any location in the employ of the Employer." Among the employees named was one W. F. Grosvenor, of Chicago, who was listed as a "collector" and bonded for $10,000. Grosvenor, who was in business under the name of Grosvenor Music House, disappeared in August, 1928, owing over $13,000 to plaintiffs, who then made claim upon defendant for the amount of his bond. Payment was refused and this suit followed. The jury returned a verdict in the full amount of the bond, with interest. From the judgment entered thereon, defendant appealed, assigning as error the overruling of its motions for binding instructions and judgment n. o. v.

In 1924, over two years prior to the time when the bond was written, a contract was entered into between Grosvenor and the plaintiff investment company whereby Grosvenor sold to the investment company "notes, contracts, leases and mortgages, evidencing the sale or lease of pianos and other musical instruments," and thereafter collected for the investment company the sums due on such obligations, payment of which he guaranteed. It was further provided in this contract that Grosvenor would hold all property repossessed by him as collector for disposal according to the investment company's instructions. Under this agreement, Grosvenor was not paid by the investment company; the consideration for his services was, as recited in the contract, the securing of possible customers for his store by reason of the fact that the obligors on the installment contracts would come there to make payments, and the protection of his guaranty of payment of the notes by supervision of collection. The arrangement existing under this contract was, so far as is shown by the record,

the only one existing between Grosvenor and either of the plaintiffs at the time of the execution of the bond, and it was in his capacity as collector under this contract that he was bonded. Subsequently, on March 31, 1928, the plaintiff piano company entered into an agreement with Grosvenor, called a "consignment contract." According to this instrument, Grosvenor was to take on consignment merchandise shipped to him by the piano company, which merchandise he agreed to sell for the company for cash or on installment contracts, which were to be evidenced by notes payable to the piano company and secured by chattel mortgages or conditional sales contracts. It was also stipulated in the consignment contract that "the Consignee [Grosvenor], when requested by the Company or its assigns, will assist in making collections on sales made by the Consignee; and also will foreclose mortgages and/or repossess musical instruments; all without costs or expense to the Company." It was after the execution of this contract that Grosvenor's defalcations occurred. When he absconded in August, 1928, he owed the piano company over $5,000 on account of cash sales of consigned merchandise, and the investment company over $8,000, $2,000 on account of sums collected on installment contracts and $6,000 on account of sales of repossessed instruments.

The principal controversy is as to whether Grosvenor was, at the time his defalcations occurred, an employee of plaintiffs within the meaning of the bond. Appellant contends that Grosvenor conducted a business of his own, and was not in any sense an "employee" of either of the plaintiffs, that his relation to them was that of an independent contractor, and that therefore he was not such a person as was intended to be covered by the bond. The bond, however, must be interpreted with reference to the circumstances existing prior to and contemporaneous with its making, in order that the intention of the parties may be ascertained and the purpose to be served by its execution effected: Richardson v. Clements,

89 Pa. 503; McKeesport Machine Co. v. Ins. Co., 173 Pa. 53; McMillin v. Titus, 222 Pa. 500; Myers's Est., 238 Pa. 195; Nimlet's Est., 299 Pa. 359; Hild v. Dunn, 310 Pa. 289; Restatement, Contracts, section 230. As we said in Hild v. Dunn, supra, at page 293, an agreement "should be construed in the light of the facts and circumstances under which the parties contracted. These form a sort of context that may properly be resorted to as an aid in interpreting the contract, to the end that the objects and purposes of the parties may be carried into effect." When these matters are taken into consideration, it is apparent that appellant's argument has no application to the arrangement existing between Grosvenor and the plaintiff investment company at the time the bond was entered into. The testimony shows that before the bond was written its terms were discussed over a period of six weeks by a vice-president of plaintiff companies and an officer of appellant. Obviously one of the risks against which plaintiffs wished to be insured was that of loss by the investment company of sums which its collectors might collect but not remit. Accordingly, then, when among "the employees named in the schedule attached" to the bond there were listed a number of these collectors, the parties demonstrated that they considered them to be "employees" within the meaning which they intended that term to have. Grosvenor was one of the investment company's collectors, and, therefore, the fact that he was in business for himself did not prevent him from being an employee within the meaning of the bond. Appellant knew and understood that among the collectors listed in the schedule of the bond were independent agencies not acting exclusively for and under the direct control of plaintiffs; among those listed were companies such as the "Alford & Fryar Piano Co.," "Canfield Piano Co.," and "National Piano Stores, Inc.," whose relation to plaintiffs was obviously not that normally denoted by the terms employer and employee. It may well be that Grosvenor was not, prop-

erly speaking, an employee of the plaintiff investment company, but under the circumstances that fact does not avoid appellant's liability on the bond. In that instrument the parties intended Grosvenor and others, including corporations, to be covered by the generic term "employee," and whether that was the proper word to use or not makes no difference, because the intention of the parties to consider all those listed as covered by the bond is apparent. We cannot see how any other conclusion can be reached.

Appellant argues, however, that the real relation between Grosvenor and the investment company was not that of employee and employer, but that of debtor and creditor, that Grosvenor has merely failed to pay his indebtedness to the investment company, and that therefore, as nonpayment of a debt is not an act of "dishonesty," "fraud," or the like, the risk insured against by the bond has not occurred. This argument is based upon the assumption that Grosvenor had the right to use as his own the money which he collected for the investment company. There is nothing in the record to support this assumption, and it must fall for that reason. Authority to use his principal's money as his own is not to be inferred from an agent's authority to collect, and, in the absence of evidence to show that Grosvenor had any greater authority from the investment company than collecting agents normally have, we cannot assume that he possessed such authority. It cannot be successfully contended that any losses sustained by the investment company as a result of its dealings with Grosvenor under the contract of 1924 were not covered by the bond.

When we turn to the consignment contract of 1928 between Grosvenor and the plaintiff piano company, an entirely different situation presents itself. This contract was not even in existence when the bond was entered into, and therefore it cannot be said that the parties intended at that time to cover losses that might arise under it. The inquiry, then, is whether the arrangement

which the consignment contract created falls within the terms of the bond: was it the sort of arrangement that the parties intended to be covered by the bond? If it were, the fact that the contract was not entered into until long after the bond was executed would make no difference. This question must be answered in the negative. The bond was intended to cover employees, including those whom the parties meant to fall within that term. This of course cannot include an independent contractor, and the most casual reading of the consignment contract makes it clear that under it the relation of Grosvenor to the piano company was that of an independent contractor—it is impossible to conclude that the parties to the contract considered themselves employer and employee. Under the consignment contract, Grosvenor, as a retail merchant having his own separate and independent business establishment, obtained merchandise from the piano company, not to be paid for until sold, the merchandise meanwhile remaining the property of the piano company. Although, according to the contract, Grosvenor was to sell the instruments consigned "for" the piano company, he did not become the latter's salesman. The provision in the contract as to Grosvenor's compensation makes this apparent. He was not paid by the piano company, but received as his remuneration any amount for which the instruments consigned were sold in excess of the consignment price. Grosvenor's real relation with the piano company under this contract was that of an independent merchant selling goods at prices fixed by himself and making as profit the margin between the cost of the goods and the selling price. In addition, the piano company stipulated in the contract that Grosvenor should keep the merchandise while in his possession fully insured at his own expense, that when instruments were sold on installments the notes evidencing deferred payments should be payable to the company, and that Grosvenor should guarantee their payment. Far from having the effect of making

Grosvenor the piano company's employee, these provisions make it apparent that he was an independent contractor, not in any way under the company's direction or control. The words of the bond itself demonstrate that this was not the sort of arrangement which the parties had in contemplation when the bond was made or which they intended to come within its terms. Appellant's contention that the losses of the plaintiff piano company under its consignment contract with Grosvenor are not covered by the bond is clearly correct, and must be sustained.

Appellant further contends that by the making of the consignment contract Grosvenor's relations with plaintiffs were so changed as to constitute a variance from the risk insured against, and thus release it from liability on its bond. It is argued that even if Grosvenor was an employee of the investment company within the meaning of the bond when that instrument was executed, "the consignment contract changed it all," and the relation between Grosvenor and the plaintiffs thereafter was one of debtor and creditor. This argument has absolutely no merit. The contract of 1924 was between Grosvenor and the plaintiff investment company, while the subsequent consignment contract of 1928 was between Grosvenor and the plaintiff piano company, and the investment company was not a party. Appellant does not point out how the provisions in Grosvenor's contract with the piano company could be binding upon the investment company, which was a separate corporate entity. The relation between Grosvenor and the plaintiff investment company did not change at all, and he continued to do for the investment company what he had done before. Grosvenor's undertaking in the consignment contract to aid the piano company's assignees in collecting upon installment contracts cannot in any way be considered a supersedure of his existing express contract to act for the investment company in collecting notes held by it. The consignment contract with the plaintiff piano com-

pany created an altogether independent arrangement which in no way conflicted with the work done by Grosvenor for the plaintiff investment company under the contract of 1924, and it was in his capacity as collector for the investment company that he was bonded. After the execution of the consignment contract, Grosvenor's relations with the investment company remained as before, governed by the contract of 1924, while coexistent with that arrangement another contract was in effect between Grosvenor and the piano company. His dealings with the investment company were covered by the terms of the bond, those with the piano company under the consignment contract were not.

The jury, in rendering its verdict in favor of plaintiffs for $11,763.12, apportioned $6,400 and interest to the claim of the plaintiff investment company, and $3,600 and interest to the claim of the plaintiff piano company. Since the jury was faced with the problem of bringing the amount of the verdict within the amount of the bond, it was necessary for it to scale down both claims, which apparently it did. It is only fair, therefore, that a new trial be granted, unless plaintiffs prefer to accept the sum which the jury awarded on the investment company's claim, to wit, $6,400 with interest.

The judgment of the court below is reversed, and the record is remitted with directions that the court below enter an order awarding a new trial, on the sole issue of the amount of damages, unless, within such time as the court below shall designate, plaintiffs shall remit all the verdict in excess of $6,400 with interest for two years, eleven months, and eight days, in which case judgment shall be entered for plaintiffs for that sum.