Fraser Fund et al. *v.* Fraser et al., Appellants.

Argued, Oct. 2, 1944. Before MAXEY, C. J., DREW,
LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

554

 

*John C. Bane, Jr.,* with him *Edmund K. Trent,* and *Reed, Smith, Shaw & McClay,* for corporation, its directors, the trustees and A. N. Fraser, individually, appellants.

*Robbin B. Wolf,* for employee group, appellants.

*A. W. Henderson,* with him *Moorhead & Knox,* for plaintiffs, appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, November 27, 1944:

This litigation arose over the voting control of a Pennsylvania corporation of the second class, the monetary value of whose stock appears presently to be of little value. The contest is between the sellers of a majority of such stock and the purchasers thereof under a conditional sale. Additional defendants were added whose rights arose through the purchasers. The contracts of purchase provided that in the event of default the stock should be reassigned to the sellers. The learned court below found that the principal purchaser considered that he had made an improvident bargain. Instead of attempting to renegotiate the contracts of sale he sought relief in corporate "maneuvering". The result of the various and intricate corporate actions was to permit the buyers of the stock to retain voting control, despite default, and thus prevent the performance of the terms of the sale agreements. By the decree appealed

from (1) the defendants were enjoined from merging with another corporation; (2) an amendment to the charter was annulled, the stock issued thereunder cancelled and new stock ordered to be issued to replace same; (3) employee purchasers of stock irregularly issued and purchased were to be reimbursed. The decree was affirmed by the court in banc and these appeals followed.

The facts and circumstances, which are exceptionally involved and complicated, must be stated in some detail. The corporate defendant, McCann and Company, is a large retail grocery and provision store with its principal place of business in Pittsburgh. From approximately 1900 to 1933, the company's affairs were dominated by its president, Walter P. Fraser, who was the owner of a large majority of the outstanding stock. The authorized stock, in 1929, consisted of 10,000 shares of preferred and 1,141 of common. In that year, Walter P. Fraser transferred to the Fraser Fund, the corporate plaintiff, 673 shares of common stock, representing a majority of the voting shares. The Fraser Fund was, for all practical purposes, a family holding corporation with certain charitable purposes. Its executive secretary is Arthur F. Purkiss, an ordained minister, and the other directors are Sarah H. Fraser, wife of Walter P. Fraser, and his sons, Stephen H. Fraser and John H. Fraser; the latter of whom succeeded his father in the presidency of the Fund after the latter's death in 1936. McCann and Company was an exceedingly prosperous venture from 1900 to 1929 and its common stock had, during that period, a book value of $1,000 per share. In 1929, the corporation undertook the construction of a large retail food department store in the heart of the Pittsburgh business district. For this purpose it was obliged to incur mortgage obligations to the Fidelity Trust Company of Pittsburgh in the amount of $1,260,-000. The new building was completed in the closing months of 1929 and proved in the depression years which followed to be an onerous burden to the corporation.

Shortly after the completion of the new building, Walter P. Fraser brought to the corporation his brother, A. N. Fraser, as Secretary-Treasurer and a member of the Board of Directors. On June 24, 1933, Walter P. Fraser and the Fraser Fund entered into an agreement with A. N. Fraser whereby the Fraser Fund agreed to transfer to A. N. Fraser its 673 shares of voting common stock, representing 59% of the voting shares outstanding. This agreement provided that A. N. Fraser should have the power to vote these shares and to exercise ownership over them, *subject, however,* to the terms of the agreement. The parties agreed that the value of the shares at the time of the transfer was $307 per share, and in exchange for the transfer thereof A. N. Fraser agreed to pay to the Fraser Fund a purchase price to be determined in the following manner: On December 31, 1937, the value of the shares was to be appraised. If it should be found to be in excess of $307, A. N. Fraser was to pay, on December 31, 1947, the purchase price of $217 per share plus 50% of the increment in value of the shares. If, on the other hand, it was found at the time of appraisal that the shares were worth $307 each or less, A. N. Fraser was to pay on the same date, ten years thereafter, the sum of $217 per share. From the date of agreement to the final acquisition of the stock by A. N. Fraser he was to pay interest at 6% upon an assessed value of $217 per share to the Fraser Fund. Upon any default in the payment of interest or purchase price, the shares were to be cancelled and reissued to the original owner, the Fraser Fund. All payments made by A. N. Fraser prior to default were to be forfeited. It was agreed that the corporate defendant, McCann and Company, should cancel the shares upon its books and reissue new shares to the Fraser Fund if A. N. Fraser defaulted.

The effect of this agreement was to give A. N. Fraser actual control of the management of the corporation by

a conditional sale to him of the majority of shares. It was expressly provided, however, that the shares transferred to him should be non-negotiable, and it was clearly intended that they should be the security for his promise to pay. Shortly after the execution of this agreement, Walter P. Fraser retired from active participation in the business and A. N. Fraser was elected President. By similar agreements between A. N. Fraser and each of the plaintiffs, Stephen H. Fraser, John H. Fraser and Arthur F. Purkiss, A. N. Fraser acquired control of 10 shares of stock owned by each of these persons individually. By another similar agreement, he acquired 250 shares of common stock owned by Sarah H. Fraser. This acquisition of 280 shares in addition to the 673 shares previously acquired from the Fraser Fund amounted to 83% of the voting stock of McCann and Company. He also owned individually and outright 25 other common shares.

As the depression continued, the obligations of A. N. Fraser under the agreements became increasingly burdensome. It is apparent from the testimony that he had no means of meeting these obligations save through dividends paid by the corporation which were to be applied to the purchase price of the shares under each of the contracts recited and by salary and other compensation paid to him as an officer. In 1934, all of the parties agreed to a reduction of the interest rate upon the assessed purchase price from 6% to 4%. After he acquired control of the corporation, the salary of A. N. Fraser had been increased from $15,000 to $27,000 with the intention that the annual interest on his stock purchase obligations should be met out of the $12,000 additional salary. He did not, however, reduce this salary proportionately when the interest rate on his obligations was reduced.

In 1935, because of some doubts as to the effectiveness of the contracts in the event of the death of A. N. Fraser or his retirement from the business, all of the

agreements were amended to provide that his death or retirement would not terminate the contracts, if prior thereto he appointed trustees and transferred to them the stock acquired from plaintiffs subject to the provisions of the original purchase agreement. Pursuant to these amendments, A. N. Fraser on December 24, 1935, transferred to himself, C. M. Kefover, D. E. Robinson and Mary E. Eichelberger all of his voting shares which were at that time 1,070 in number. The trust agreement provided that the trustees should have the power to vote the stock and that they should assume the obligations of A. N. Fraser under his stock purchase agreements with the plaintiffs. It was also expressly provided that the transfer was subject to the conditions of the original purchase agreements and that the stock should be non-negotiable in the hands of the trustees. A. N. Fraser originally reserved the power to veto the voting privileges of the trustees, but upon his release of this reserved power, the trustees became and were at the time of the corporate transactions here involved, the persons in actual control of McCann and Company. This trust was designated as the McCann Trust and it appears from the evidence to have been dominated by the personal wishes of A. N. Fraser.

In 1939, the difficulties of the corporation had become such that default upon its mortgage obligations to the Fidelity Trust Company, which expired in 1939, could no longer be ignored. In July of that year, McCann and Company entered into a very advantageous salvage agreement with the mortgagee whereby delinquent interest in the amount of $250,000 was satisfied for the sum of $20,000; the interest rate was reduced from 6% to 2.8% and the mortgage was extended for 10 years to 1949. In return it was agreed that the corporation should declare no dividends upon common stock until 1949 and that it should endeavor to obtain a reduction of its accrued obligations to the preferred shareholders which were also delinquent. An officer of

the mortgagee, Frank F. Doak, by agreement was placed upon the Board of Directors of McCann and Company to represent the interest of the mortgagee.

While this agreement temporarily eased the financial position of McCann and Company, it deprived A. N. Fraser of the only available means of meeting his obligations under the stock purchase agreements with the plaintiffs by the payment of dividends on the common stock. The McCann Trust was in no better position and had no resources other than the proceeds received from McCann and Company. It appears, therefore, that A. N. Fraser knew in 1939 that he would be unable to consummate his agreements with plaintiffs. His conduct thereafter appears to have been directed to an attempt, entirely understandable, to retain control of the business despite his impending default. It also appears that the shrinkage in value of the common stock, which he had agreed to purchase, convinced him that he had made a bad bargain and led to a feeling on his part that morally he was entitled to relief from the terms of the original agreements. At least as early as June, 1940, he began to openly discuss with plaintiffs the possibility that he might default upon all of the agreements except his agreement with Sarah H. Fraser, the widow of his brother. This resulted in negotiations with plaintiffs whereby A. N. Fraser endeavored to acquire an extension of time and at the same time to acquire the 1,512 preferred shares held by the Fraser Fund. These negotiations continued for some time without success. In February 1941, a significant transaction occurred which seems to indicate that A. N. Fraser had given consideration to retaining control of the corporation by means other than negotiations with the plaintiffs. At that time the Board of Directors of McCann and Company adopted a resolution for the payment of a bonus of $75,000.00 to A. N. Fraser for which the latter agreed to take the 859 shares of common stock which he apparently believed were authorized but unissued. The transaction was not

successful because it was subsequently ascertained that the authorized common stock of the corporation consisted of no more than 1,141 shares already outstanding. It should be noted, however, that, had the proposed transaction succeeded, the McCann Trust would have been in control of a majority of the proposed 2,000 outstanding shares of common stock even though plaintiffs' 953 shares were lost by default.

On February 10, 1941, shortly after this abortive transaction, A. N. Fraser met the demands of plaintiffs and entered into an agreement with them whereby the time for the purchase of his stock was extended to December 31, 1957. It was also agreed that the 1,512 shares of preferred stock were to be sold to A. N. Fraser for $5,000 and were to be immediately cancelled. Heretofore, A. N. Fraser had refused to accede to the cancellation of these shares upon their acquisition by the McCann trustees. It was also provided that in order to protect each of the plaintiffs from default by A. N. Fraser upon any of the agreements not necessary to keep the control of the corporation in the hands of the McCann trustees, all of the stock purchase agreements should be so related that a default upon one would constitute a default upon all of the others.

As a result of this second amendment, A. N. Fraser was permitted to remain in control of the corporation for ten additional years, but he was still obligated to purchase the shares at the price of $217 which was far in excess of their actual value and to pay the current interest to the plaintiffs. These conditions and the status of McCann and Company were so disquieting to A. N. Fraser that in 1941 he consulted new corporation counsel regarding the solution of his difficulties. According to his testimony, he was principally, if not entirely, concerned with the condition of McCann and Company, which had grown progressively worse as the result of labor troubles and the restlessness which prevailed in business prior to our entry into the war. Corporate

counsel advised him that a reorganization of the capital and share structure of the corporation was imperative, and that while such reorganization could possibly be accomplished under the Federal Bankruptcy Laws, it might, in the alternative, be achieved by merging Mc-Cann and Company with one of its inactive subsidiaries, McCann Foods, Inc. To effect such a merger, however, it was necessary that the consent of a majority of both the preferred and common shareholders be obtained. In view of his previous failure to obtain consent of the preferred shareholders to a reduction in the par value of such shares and a cancellation of accrued delinquent dividends, it was decided that the first step in the reorganization should be an increase in the number of shares of authorized common stock. Defendants at the trial contended that the purpose of this increase was to enable the corporation to retain the services of a small group of key employees who occupied executive positions and whose salaries had not been increased in proportion to their merit and to the increases obtained by the majority of the corporation's employees through collective bargaining. On February 19, 1942, the McCann trustees voted to recommend the amendment of the charter of McCann and Company to increase the authorized common stock to 10,000 shares of a par value of $1.00 each. The proposal required a reduction in the par value of the outstanding 1,141 shares from $100 to $1.00 by the simple bookkeeping device of transferring an equivalent amount from capital to capital surplus. This proposal was recommended to the stockholders at a meeting of the trustees of McCann and Company. A special stockholders' meeting was called for May 7, 1942. No notice of this meeting was given to plaintiffs who were not actively interested in the internal management of McCann and Company and who had never previously been notified of stockholders' meetings. The trustees of McCann and Company cast the majority vote of the common stock in favor of the proposed amendment

which was immediately advertised. The advertisement came to the attention of counsel for plaintiffs on May 11, 1942, which was the first time they received notice of the proposed charter amendment. Their counsel immediately wrote to the Secretary of the Commonwealth expressing objections to the proposed amendment and obtained a postponement of action upon the application of the corporation. Thereafter, on May 27, 1942, counsel for the plaintiffs met with A. N. Fraser and his counsel to discuss the proposed amendment. In his testimony concerning that conversation, counsel for plaintiffs said he could not remember and did not ascribe to A. N. Fraser or his counsel any statement at that meeting which would amount in itself to misrepresentation. He did testify, however, that it was explained to him that the purpose of the increase in the common stock was to reward a few faithful executives by permitting them to become shareholders and to effect a reduction in capitalization which would benefit the corporation. He stated that he was definitely given the "impression" that it was not intended that a large number of shares should be issued. Certainly, he was not told that the issue of new stock would be such as to affect the control of the corporation. At the same meeting the obligations of A. N. Fraser on his several contracts of stock purchase with plaintiffs were discussed and he was entirely noncommittal upon his intention of fulfilling any of the contracts except his agreement with Sarah H. Fraser.

As a result of his understanding of the intention of A. N. Fraser regarding the authorized increase of common stock, counsel for the plaintiffs was instructed by them to withdraw his objection to the charter amendment and it was approved by the Secretary on June 11, 1942. One month later, without notice to plaintiffs or their counsel, the directors of McCann and Company authorized the issuance of *1,550 new shares* of common stock to 20 key employees. This resulted in transferring the control of the corporation from the McCann trustees

to the executive employees who were apparently devoted to the leadership of A. N. Fraser. Many of these employees were called as witnesses in the hearing before the chancellor and were questioned concerning the statement of A. N. Fraser that the issuance of stock to them was imperative in order to retain their services. Nine of the witnesses called testified that they had never threatened to leave the corporation. All of them were employees with responsible positions; the great majority of whom had been with the corporation for many years. The most that was said by any of these witnesses was that they would have left the employ of the corporation for better positions if such positions had been offered to them, but that they were not actively engaged in seeking other employment. In view of the small value of the shares at the time of the transfer to them, it is doubtful whether any of these executives who was inclined to leave the employ of the corporation would have been deterred by the transfer to him of such shares. The stock had been, prior to the transfer, appraised by a reputable firm of accountants at $1.12 per share, and they were sold to the employees for the price of $2.00 per share. The effect of the transfer, if any, upon the loyalty of this group rested solely in the psychological factor of vesting in them not merely ownership of shares in the corporation, but in giving them, as a group, actual control of the corporation.

After this transaction, the directors of McCann and Company on September 9, 1942, voted to approve a plan of merger with McCann Foods, Inc., the salient features of which were that all delinquent accrued dividends on the existing preferred stock were to be cancelled and the par value of the stock was to be reduced from $100 to $1.00 per share by transfer of capital to capital surplus. In return the preferred shareholders of McCann and Company were to receive common and preferred shares of the new corporation resulting from the merger. Before submitting this plan to the stockholders, A. N.

Fraser sent a copy thereof to Sarah H. Fraser, and shortly thereafter the present suit was instituted.

Two principal questions are presented: The first is whether or not there was fraud on the part of the defendants, and the second is whether the conduct of the principal defendant, A. N. Fraser, and his associate voting trustees, was a violation of the contracts entered into between these defendants and plaintiffs for the sale of the stock by plaintiffs to defendants, whereby these defendants were enabled to acquire control of the corporation.

Defendants' principal contention is that all of the actions complained of were lawful, and therefore, in the absence of proof of actual fraud, the court below should have refused the relief requested. They aver that the conclusion of the court below based upon its interpretation of the stock purchase agreements is rested upon matters not presented at the trial of the case. They also allege that the agreements were not breached. We can agree with none of these contentions, nor with the allegation that plaintiffs were guilty of laches.

The court below held that the violation of the contracts in itself was sufficient to justify its action without proof of actual fraud. The chancellor did, however, find that the conduct of A. N. Fraser and the trustees of the McCann Trust was "constructively fraudulent". There is ample evidence to support the chancellor's conclusion that A. N. Fraser, with the knowledge and assistance of the trustees, deliberately endeavored to circumvent the contracts with plaintiffs by corporate action. This purpose was manifest from June, 1940, to the final attempt to consummate the merger. It may be found in the utterances of A. N. Fraser, in the transaction of February, 1941, and in the method whereby control of the corporation was vested in the new shareholders. It is true that plaintiffs did not prove actual words of misrepresentation, but it is clear that A. N. Fraser and his associates concealed from plaintiffs their

attempts to deprive the stock purchased from plaintiffs of its principal value, which was the *voting control* of the corporation. Under the agreements it is clear that the transfer of stock to A. N. Fraser was for the purpose of giving him such control, conditionally. The agreements must be construed in their entirety in determining the intention of the parties. See *Frederick Investment Company v. American Surety Company of New York*, 314 Pa. 1, 169 A. 155; *Nusbaum v. Hartford Fire Insurance Company*, 276 Pa. 526, 120 A. 481; *Vulcanite Paving Company v. Philadelphia*, 239 Pa. 524, 86 A. 1086. Obviously, the purpose of providing for reissuance of the stock to plaintiffs in the event of default was to assure them that the control of the corporation should revert to them if A. N. Fraser failed to carry out the terms of the sale. The *monetary* value of the stock in itself was not the primary consideration. The status of the shares was enhanced by the fact that they represented the power of control over the corporation. Corporate control in itself is a valuable property right. See *Fidelity-Philadelphia Trust Company v. Simpson*, 293 Pa. 577, 143 A. 202.

When the agreements were drawn it was not contemplated that A. N. Fraser could default on his obligation and retain control of the corporation. While he was authorized to vote the shares at his discretion and to treat them as his own, these powers were expressly limited by the provision of the agreements that the transfer to him was subject to the terms thereof. Clearly it was not intended that he should use this voting power to destroy the principal value of the stock and thereby be enabled to repudiate his agreements and deprive plaintiffs of the control of the corporation which was to have reverted to them upon his default. While A. N. Fraser and the trustees were not bound to preserve the *monetary* value of the shares, they were bound to preserve the *voting power* of the shares. This obligation imposed implicit restrictions upon the power of A. N.

Fraser and his associates to reorganize the corporation.

Under these circumstances, it was the duty of A. N. Fraser and his associates to inform plaintiffs of the full implication of the charter amendment. There is no doubt that this was concealed from plaintiffs and their counsel. Such concealment, in itself, and the advantage taken of it by A. N. Fraser and his associates constituted fraud. Whether the fraud was actual or constructive is immaterial. In Pomeroy, Equity Jurisprudence (5th ed.), Section 873, it is stated: "Fraud in equity includes all wilful or intentional acts, omissions, and concealments which involve a breach of either legal or equitable duty, trust, or confidence, and are injurious to another, or by which an undue or unconscientious advantage over another is obtained." There is little merit, therefore, in defendants' contention that fraud was not established. In this connection, however, it must be observed that there appears to be no evidence of fraud upon the part of the employee defendants who benefited by the increased issuance of corporate stock. Their rights, nevertheless, were derived from the corporate acts which are the subject of this bill and are not superior to the rights of plaintiffs.

Even if no fraud were present, there is sufficient evidence of breach by A. N. Fraser and his trustees of the contracts with plaintiffs to justify equitable relief. For this, plaintiffs cannot be compensated by damages because the value of corporate control is intangible and not subject to reduction to monetary equivalences. Plaintiffs' rights under the contracts are, however, entitled to protection and it is the province of equity to give relief where other remedies are futile or illusory. While it may be true, as defendants contend, that the shares of stock are valueless and that the corporation could be reorganized under Federal statute, it is clear that plaintiffs are entitled to have these facts proved before an appropriate tribunal and that defendants cannot by unilateral, private action attempt to nullify the rights which plaintiffs still possess under their agreements.

The decree of the court below is affirmed. Costs to be paid by appellants.