RICHARD W. STASCH, t/a R. W. Stasch & Company, Plaintiff, v. UNDERWATER WORKS, INC., a Corporation of the State of Pennsylvania, Defendant.

(*March* 17, 1960.)

TERRY, P. J., sitting.

*Louis J. Finger* (of the firm of Richards, Layton and Finger) for the Plaintiff.

*Andrew B. Kirkpatrick, Jr.,* and *Walter K. Stapleton* (of the firm of Morris, Nichols, Arsht and Tunnell) for the Defendant.

Superior Court for New Castle County, No. 1403, Civil Action, 1959.

TERRY, P. J.:

This action arose as follows:

On December 11, 1958, plaintiff, Richard W. Stasch, trading as R. W. Stasch & Company, filed a complaint and affidavit in Foreign Attachment, wherein it is alleged that the defendant, Underwater Works, Inc., a Pennsylvania corporation, is indebted to the plaintiff in the amount of $35,000, for rental and services of a derrick and crew. On the same date, pursuant to the provisions of Title 10, Delaware Code, Sec. 3507 and Sec. 3510, a Writ of Foreign Attachment was issued to the Sheriff of New Castle County, commanding him to attach the defendant's real and personal property. The Writ was purportedly executed by attaching certain hull remnants of the Acid Barge O. M. C. C. No. 4, situated on the bank of the Chesapeake and Delaware Canal, near St. Georges, Delaware. No personal service was had upon the defendant.

The defendant appeared specially, by counsel, solely for the purpose of entering a motion pursuant to Rule 12(b) (4) of the Rules of Civil Procedure of this Court, *Del. C. Ann.*, by which it urges the Court to enter an Order vacating and quashing the Writ of Foreign Attachment.

The defendant grounds its motion upon the contention that the defendant had no right, title, or interest in the salvaged remnants of the barge upon which to apply the said Writ. In part, the efficacy of this motion turns upon a construction of a contract between the defendant and the United States of America, hereinafter designated Government.

The contract was signed June 10, 1959, between the defendant and the Corps of Engineers on behalf of the Government. By its terms, the defendant became obligated to remove and satisfactorily dispose of the sunken Acid Barge O. M. C. C. No. 4, which was, at the time, upon the bottom of the Chesapeake and Delaware Canal, near St. Georges.

On the date of the issuance and execution of the Writ of Attachment, the work under the contract had not been com-

pleted. This fact is most significant, for the question of construction involves a determination as to when the title to the wreck vested in the defendant.

The contract contains three clauses particularly pertinent to this issue. They are as follows:

"Article 4. *Payments:* In consideration of the faithful performance hereof, the contractor shall receive the following:

"(a) Payment in the lump sum of $24,900.00.

$$* \quad * \quad * \quad * \quad * \quad *$$

"(b) Title to all property not specifically designated in the specifications as being retained by the Government shall vest in the contractor immediately upon the execution of this contract. * * * All property acquired by the contractor hereunder shall be removed from the site by the contractor promptly as the storage of such property on the site will not be permitted beyond the completion hereof. * * *"

"Part III. Special Conditions

"SC-3 *Payment.*—Payment will be made in one lump sum as soon as practicable after the full completion and acceptance of all work covered by the contract. * * *"

"SC-10 *Removal of Wreck.*—In accordance with Section 19 of the River and Harbor Act approved 3 March 1899 [30 Stat. 1121], the wreck, including property, contents, and attachments of the vessel, shall become the property of the contractor upon satisfactory completion of the work of removal. * * *"

It is noted in the record that defendant had, as of the time of the purported attachment, already sold, delivered and received payment for some 82 gross tons of the scrap steel removed from the first section of the Barge. Furthermore, the District Engineer of the Corps of Engineers, in a letter to defendant's counsel, states that, "* * * the litigation (in question) is not

a matter of direct concern to the administration of the Government contract with Underwater Works, Inc."

The plaintiff, as contractor's creditor, maintains that the attachment is valid for one of two reasons: (a) That the defendant contractor had "title" to the property at the time of the attachment, and (b) that in any event, defendant's rights in the property were subject to attachment, even if it did not in fact have "title".

The defendant's motion to vacate or quash the Writ of Attachment, and thus dismiss the action, is also predicated on two contentions, one of which has been abandoned. The sole contention maintained, therefore, is that the defendant had no right, title, or interest in the salvage metal to which the Writ of Attachment could apply.

In attempting to construe the contract in question, the plaintiff urges that the word "execution" as it appears in Article 4(b) of the contract means signing, sealing and delivery of the contract, and hence this sub-section must be read to mean that the title to the wreck vested in defendant on June 10, 1959, the date the contract was signed, etc., by the parties thereto.

The defendant, however, argues that the word "execution" in the above noted article means performance, and it points to the special conditions, particularly SC-10, as noted above, wherein it is expressly stated that the wreck "shall become the property of the contractor upon satisfactory completion of the work of removal".

A careful reading of the contract as a whole sustains the plaintiff's contention that "execution" as used in Article 4(b) did in fact mean signing, sealing and delivery of the same.

Both parties attempt to construe the contract in such a manner as to demonstrate that no conflict does in fact exist. Their efforts in this respect have not been successful. Article

4(b) certainly conflicts with Special Condition SC-10. This being so, the question is: Which clause governs?

Article 4, taken as a whole, is a general provision. A portion of sub-section (a), omitted in the quotation set forth above, concerns itself with partial payments on a *pro rata* basis of the $24,900 contract price, "unless otherwise provided", and, of course, Specific Condition SC-3, as set forth above, does so otherwise provide. Sub-section (b) refers to "all property not specifically designated in the specifications as being retained by the Government." These provisions appear in the first part of the overall contract document. They are general in scope, as are all of the other articles in the first part of the contract. The Articles are in the nature of standard contract clauses, and as such are quite all-embracive and applicable to contracts of this nature in general. However, the Special Conditions (specifications), which are attached to and made a part of the overall contract, are not of a general scope. To the contrary, they are of a specific and special character with reference to the particular work in question, the removal of the sunken Acid Barge O. M. C. C. No. 4.

 Special Condition 10 must be considered as the controlling clause under the principle that "Where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions." *Restatement of Contracts*, Vol. 1, Sec. 236 (c). This is so because of the "reasonable inference that specific provisions express more exactly what (the) parties intended than broad or general terms." *Id.—Comment on Clause* (c).

 This being so, it must be concluded that no title would vest in the defendant in respect to the recovered portion of the salvage until "satisfactory completion of the work of removal". Said completion not having occurred on the date of the purported attachment, there was no title in the defendant on that date.

In the light of this conclusion, it makes no difference to the result whether the District Engineer was or was not concerned with the outcome of this litigation. Nor does the sale by defendant of previously salvaged scrap have any bearing on our conclusion, for the rights and title of the defendant under the contract have become quite clear. It is not shown whether or not the Government was aware of defendant's sale of the scrap, but even if it were, it would be of no significance, for the Government could have well waived its rights under the contract to the scrap so sold by defendant if it so chose. It would also follow that the Government could have prevented such a sale if it saw fit.

The plaintiff advances an alternative theory to sustain the attachment under which it is urged that even if defendant did not have title, it was, nonetheless, possessed of such an interest in the property, accompanied by possession, as would support an attachment. To give weight to this theory, the plaintiff has cited a number of cases, one of which we will now examine.

*Starr v. Govatos, Super. Ct. Del.* 1925, 3 *W. W. Harr.* 66, 130 *A.* 392, is urged upon us as being "squarely on point". An examination of this case does not move us to give it such status. Vendee bought a car from Vendor under a Conditional Sales Contract, wherein one of the terms was that Vendee should keep the car free from all encumbrances. Vendee's creditors attached the car as being the property of the Vendee. This prompted Vendor's assigns to institute a Replevin Action, and have the Coroner further attach the car, which at the time was in possession of the Sheriff under the first attachment per Vendee's creditors. In adjudging the efficacy of the situation, the Court held that the creditor's attachment of the car constituted a lien or encumbrance upon the car in violation of the terms of the Conditional Sales Contract; the result being that Vendee was thus in default under his contract. This, therefore, gave rise to a right in Vendor's assigns to replevin the car under the terms of the Conditional Sales Contract. Hence, judgment

for Vendor's assigns. By inference, it may be said, as is urged by the plaintiff in the present case, that an attachment by creditors of a conditional vendee is a valid attachment, subject to the paramount rights of the conditional vendor.

The Court in the case of *E. L. Jones & Co. v. Unruh, Super. Ct. Del.* 1935, 7 *W. W. Harr.* 241, 182 *A.* 211, 212, characterized the *Govatos* case as supporting this inference, for had the levy by Vendee's creditors not been valid, or if the Vendee had not had an attachable interest, then the execution could not have established any lien or encumbrance, and the Vendor's assigns would not have been entitled to recover possession of the car by replevin. This point is obviously indisputable. The only problem with the case involves the degree to which we are willing to stretch an analogy so as to equate a conditional vendee with the defendant in the present case. It is not possible to go as far as plaintiff requests.

In the *Unruh* case, the Court set forth the indicia of a conditional sale vendee. It referred to Sec. 13 of the Conditional Sales Act currently cited as 6 *Delaware Code*, § 913, wherein it is stated:

"Unless the contract otherwise provides, the buyer may, without the consent of the seller, remove the goods from any filing district and sell, mortgage or otherwise dispose of his interest in them; * * *."

The Court then went on to say that:

"The foregoing statute seems to be the clearest legislative expression of the existence of an interest in the vendee in the absence of restrictive terms in the contract—an interest which the vendee can dispose of and which is entirely different from a mere possessory interest. When I here used this word 'interest' it is (sic) used in direct contradistinction to 'title'. The 'title' of the conditional vendor who has complied with the provisions of the act is not disturbed and no vestige of title, as such, passes

to the vendee until payment of the debt or other condition has been fulfilled. The mortgage, sale or other disposition of the interest by the conditional vendee is subordinated to the reservation of title in the seller.

"The exact nature of the interest of the vendee is difficult to precisely define. It has been variously called 'right,' 'interest,' 'property,' and 'special property.' It is not solely an equitable interest, for certain rights are purely legal rights, *viz.*, the right, when not in default, to have and maintain replevin proceedings for the possession of the chattel, even against the vendor, and the right to pay the amount due and succeed to full title and ownership."

Obviously, the position of the conditional sales vendee with respect to the vendor and the chattel is quite different from that of the defendant in the present case with respect to the Government and the salvage removed from the wreck. Primarily, the nature of the respective contracts define completely different relationships.

The respective interests of a conditional vendee and the defendant in the present case, with regards to their respective chattels, are more dissimilar than similar, and so no direct analogy is justified which attempts to equate their interests so as to make the latter's attachable. Thus, Govatos has no merit as authority in this case.

The other cases cited by the plaintiff are from other jurisdictions. Considerable emphasis is placed upon *Knickerbocker Trust Co. v. O'Rourke Engineering Construction Co.*, 74 *N. J. L.* 53, 70 *A.* 735, and *Hart v. Seacoast Credit Co.*, 115, *N. J. Eq.* 28, 169 *A.* 648, affirmed 116 *N. J. Eq.* 573, 174 *A.* 525. A careful reading of these cases requires us to brand them as being equally uncontrolling as authority in the case at bar.

The principle laid down by Judge Morris in *In re Ford-Rennie Leather Co.*, D. C., 2 *F.* 2d 750, 754, is, in the ab-

sence of a statutory provision to the contrary, the controlling law in Delaware. The Judge said:

"The cases are a unit in holding that property in possession of a judgment debtor, but which is, in fact, owned by another, may not be levied upon and sold under judicial process against the judgment debtor. (Citing several Delaware cases.)"

It follows, therefore, that the salvage material extracted from the Canal by the defendant could not have been levied upon by a Writ of Foreign Attachment for the reason that no attachable interest therein had vested in the defendant as of the date of attachment.

For another method of analysis by way of analogy, see Sec. 4 *Am. Jur.*—Attachment and Garnishment, Sections 200, 201, 205; Annotations in 2 *A. L. R.* at page 506; 82 *A. L. R.* 115, and 134 *A. L. R.* 853.

For the reasons indicated above, the defendant's motion to quash the Writ of Foreign Attachment is granted.

An Order will be entered, upon motion.