A. Jarvis WOOD and Nettie S. Wood,
Plaintiffs, Appellants,

v.

COASTAL STATES GAS CORPORATION, Coastal States Gas Producing Co., Lo-Vaca Gathering Co., and Oscar Wyatt, Defendants, Appellees.

Supreme Court of Delaware.

Submitted Feb. 28, 1979.

Decided April 23, 1979.

Joseph A. Rosenthal, of Morris & Rosenthal, Wilmington, and Ronald Litowitz, of Kreindler & Kreindler, New York City, of counsel, for plaintiffs-appellants.

S. Samuel Arsht, Martin P. Tully and Lawrence A. Hamermesh, of Morris, Nichols, Arsht & Tunnell, Wilmington, Milton S. Gould and Michael Lesch, of Shea Gould Climenko & Casey, New York City, and Robert E. Walls, Houston, Tex., of counsel, for Coastal States Gas Corp. and Coastal States Gas Producing Co.

Wendell Fenton and William E. Manning, of Richards, Layton & Finger, Wilmington, J. Clifford Gunter, III, of Bracewell & Patterson, and Charles R. Roberts, Houston, Tex., of counsel, for Lo-Vaca Gathering Co.

Before DUFFY, QUILLEN and HORSEY, JJ.

DUFFY, Justice:

This appeal is from an order of the Court of Chancery dismissing the complaints in a consolidated class action filed by the owners of two series of preferred stock[1] in Coastal States Gas Corporation (Coastal), a Delaware corporation. The suit is against Coastal, two of its subsidiaries and its chief executive officer. While this litigation is part of a complex controversy in a mosaic of many persons and disputes, it is entirely between the owners of Coastal's preferred stock and the owners of its common stock.

I

The facts out of which the dispute arises involve the sale and delivery of natural gas to many cities and corporate users in the State of Texas and, although our involvement is limited, we must recite some of them to put the appeal into context. For that purpose, the relevant facts are these:

A significant part of Coastal's business is the gathering, transporting and marketing of natural gas, all of which is conducted by a subsidiary, Coastal States Gas Producing Co. (Producing), also a defendant in this action. Producing, in turn, has a subsidiary, Lo-Vaca Gathering Co. (Lo-Vaca), another defendant, which supplies the gas to intrastate customers in Texas, including the Cities of Austin, Brownsville, Corpus Christi and San Antonio.

As a result of several factors associated with the "energy crisis" in the early 1970s, the wellhead price of natural gas increased significantly (from about 20¢ per 1000 cubic feet to about $2.00 for the same quantity) and Lo-Vaca was unable to honor its obligations to deliver gas to its customers at contract prices. In 1973, Lo-Vaca sought and obtained interim permission from the Railroad Commission of Texas (the agency vested with jurisdiction over intrastate utilities in Texas) to increase its rates; that authorization permitted Lo-Vaca to pass to its customers certain of its own cost increases. After the higher rates went into effect, a large number of Lo-Vaca industrial and municipal customers filed suits against Lo-Vaca, Producing, Coastal and Oscar Wyatt (Coastal's chief executive officer, the owner of the single largest block of its common stock and a defendant in this suit) for breach of contract.

In December 1977, the Commission entered a final order denying Lo-Vaca's original petition for rate relief and, in effect, rescinding the interim order which had authorized the increase. The Commission then directed Lo-Vaca to comply with the contract rates and ordered Coastal, Producing and Lo-Vaca to refund the rate incre-

1. One series is designated, "$1.83 Cumulative Convertible Preferred Stock, Series B," and the other, "$1.19 Cumulative Convertible Preferred Stock, Series A." The certificate of rights and preferences for each series is identical and thus what is said herein of one is applicable to both. We will refer to the stock in the singular as "Series A," or "Series B," or the "preferred stock."

ment which had been charged to customers under the 1973 interim order. It is estimated that the refundable amount exceeds $1.6 billion—which is about three times Coastal's net worth.

Given this state of affairs, with its obvious and enormous implications for a large section of Texas, settlement negotiations were undertaken and, eventually, a complex plan evolved. It is unnecessary for us to detail the plan, but the following summary states its substance:

(1) The substantial litigation and disputes between the natural gas sales customers of Lo-Vaca and Coastal, Producing, Lo-Vaca and Wyatt, which developed as a result of the "Lo-Vaca problem," will be settled;

(2) Producing will be renamed "Valero Energy Corporation," restructured into a corporate enterprise and spun off from Coastal; it will consist principally of Producing's present gas utility pipe-line and extraction plant operations, including Lo-Vaca, and a Texas retail gas distribution division of Coastal;

(3) There will be transfers to a trust for the benefit of the customers who adopt the settlement plan ("Settling Customers") of: (a) approximately 1,196,218 shares (or about 5.3%) of the voting securities of Coastal; (b) a one-year interest-bearing promissory note of Valero in the principal amount of $8,000,000; (c) 13.4% of the outstanding shares of the common stock of Valero; and (d) 1,150,000 shares ($115,000,000 aggregate liquidation value) of Valero Preferred Stock, $8.50 Cumulative Series A;

(4) Coastal will issue to Valero approximately 805,130 shares (with approximately $80,513,000 aggregate liquidation value) of Coastal's $8.50 Cumulative Preferred Stock, Series D, $.33⅓ par value (which is a new class of stock);

(5) A long-term program will be established providing for the expenditure of $180,000,000 to $230,000,000 (subject to certain increases or decreases, with a maximum commitment estimated at $495,000,000), by Coastal to find and develop gas reserves to be made available to the Lo-Vaca System and to be offered for sale by Coastal to Valero at discounted prices and, in turn, resold to Lo-Vaca (or, in some instances, to third parties) at higher prices, with the net proceeds (in excess of the cost of gas) received by Valero on such resale to be paid to the trust for the benefit of certain Settling Customers;

(6) There will be a new gas sales rate structure for Lo-Vaca designed to stabilize it as a viable public utility.

In addition, there will be a distribution by Coastal, in the form of an extraordinary dividend chargeable to earned surplus, to its common stockholders (except Wyatt) of the balance (86.6%) of the Valero common stock not transferred to the trust referred to in (3)(c) above.[2] Shareholders will receive one share of Valero for each share of Coastal common held at the time of the spin-off. It is this distribution which is at the center of this litigation between the preferred and common stockholders of Coastal. And Coastal's dividend history of annual payments to the preferred but none (with one exception) to the common suggests a reason for this. Coastal has paid regular quarterly dividends of $.2975 per share on the $1.19 Series A and $.4575 per share on the $1.83 Series B since each was issued. Only one dividend of $.075 per share has been paid on the common in the last twenty years.

Coastal's Board of Directors unanimously approved the settlement[3] and, in August

---

2. The Valero shares trade on a "when issued" basis at $6.50 to $7.00 per share (against an assumed market value of $6.50 per share).

3. Fletcher Yarbrough, who had been nominated by the Securities and Exchange Commission to serve as a director on the Coastal Board, testified at trial that the

". . . complex of problems relating to Lo-Vaca, both before the Railroad Commission and in the litigation, simply had to be settled, that there was a truly unacceptably high risk that this problem could destroy the corporation and the value of the shares of the corporation . . . ."

1978, the Commission gave its approval. The Coastal management then submitted the plan for approval at a special meeting of its stockholders called for November 10.

\* \* \*

Holders of the Series A and Series B preferred stock, (plaintiffs), filed an action in the Court of Chancery to enjoin the special shareholders meeting. They alleged that the settlement plan breaches the "Certificate of the Designations, Preferences and Relative, Participating Optional or other Special Rights" (Certificate) of the Series A and Series B preferred stock. In essence, plaintiffs say that the plan violates their Certificate rights because the preferred will not receive any of the Valero shares, that is, the 86.6% to be distributed entirely to the Coastal common.

After a trial on the merits, the Vice Chancellor entered judgment for defendants and ordered plaintiffs to pay the costs of giving notice to the members of the class of the pendency of the action. See Court of Chancery Rule 23. The Court determined that the settlement plan and, more specifically, the spin-off of Producing and the distribution of Valero stock to the common stockholders of Coastal, is not a "recapitalization" within the meaning of the Certificate. (If it is, all parties concede that the preferred is entitled to participate in the distribution of the Valero shares.) The Vice Chancellor reasoned that a key phrase, "in lieu of," in the Certificate implies that the existing shares of Coastal common must be exchanged for something else before there is a "recapitalization" which creates rights in the preferred. And he found support for that conclusion in another Certificate provision which permits Coastal to pay a dividend to holders of common stock, in other than its own common, without affecting the rights of the preferred.

The Court also ruled that the holders of the preferred stock were not entitled to vote as a class on the settlement plan, because the requirements of the Certificate for such a vote had not been met.

Finally, the Court considered plaintiffs' claims that the settlement plan is unfair to the preferred, unjustly enriched the common and did not have a proper business purpose, and concluded that the rights of the preferred are found, under the circumstances of this case, solely in the Certificate, not in concepts of fairness or fiduciary duty.

On appeal, plaintiffs challenge each of these rulings, as well as the order requiring them to pay the costs of giving notice to the class.

## II

Before discussing the merits of the controversy, we emphasize that this lawsuit is not a general attack upon the settlement plan. On the contrary, plaintiffs say that they approve the plan and hope to see it executed. As we have observed, the case involves a dispute between the preferred *vis-a-vis* the common over participation rights in the Valero stock to be distributed as part of the spin-off. As we understand it, that is the extent of plaintiffs' attack upon the plan.

The preferred has a conversion right to exchange for the common on a one-to-one basis. Briefly stated, the preferred argues that a distribution of Valero stock to the common only, and without provision for permitting the preferred to share therein now or at the time of conversion, violates its Certificate rights. We now examine those rights in some detail.

### A.

In pertinent part, the Certificate states: "CONVERSION OF . . . PREFERRED STOCK INTO COMMON STOCK

(a) Subject to the provisions of this Article . . ., the holder of record of any . . . Preferred Stock shall have the right, at his option, at any time after the issuance of such share(s) to convert each share of . . . Preferred Stock into one fully-paid and non-assessable share of Common Stock of the Corporation.

. . . . .

(c) Conversion of . . . Preferred Stock shall be subject to the following additional terms and provisions:

. . . . .

(4) In the event that the Corporation shall at any time subdivide or combine in a greater or lesser number of shares the outstanding shares of Common Stock, the number of shares of Common Stock issuable upon conversion of the . . . Preferred Stock shall be proportionately increased in the case of subdivision or decreased in the case of a combination effective in either case at the close of business on the date when such subdivision or combination shall become effective.

(5) In the event that the Corporation shall be recapitalized, consolidated with or merged into any other corporation, or shall sell or convey to any other corporation all or substantially all of its property as an entirety, provision shall be made as part of the terms of such recapitalization, consolidation, merger, sale or conveyance so that any holder of . . . Preferred Stock may thereafter receive in lieu of the Common Stock otherwise issuable to him upon conversion of his . . Preferred Stock, but at the conversion ratio stated in this Article . . . which would otherwise be applicable at the time of conversion, the same kind and amount of securities or assets as may be distributable upon such recapitalization, consolidation, merger, sale or conveyance with respect to the Common Stock of the Corporation.

(6) In the event that the Corporation shall at any time pay to the holders of Common Stock a dividend in Common Stock, the number of shares of Common Stock issuable upon conversion of the . . . Preferred Stock shall be proportionately increased, effective at the close of business on the record date for determination of the holders of Common Stock entitled to such dividend.

(7) No adjustment of the conversion ratio shall be made by reason of any declaration or payment to the holders of the Common Stock of the Corporation of a dividend or distribution payable in any property or securities other than Common Stock, any redemption of the Common Stock, any issuance of any securities convertible into Common Stock, or for any other reason, except as expressly provided herein.

(8) The Corporation shall at all times reserve and keep available solely for the purpose of issuance upon conversion of . . . Preferred Stock, as herein provided, such number of shares of Common Stock as shall be issuable upon the conversion of all outstanding . . . Preferred Stock.

### B.

For most purposes, the rights of the preferred shareholders as against the common shareholders are fixed by the contractual terms agreed upon when the class of preferred stock is created. *Judah v. Delaware Trust Co.,* Del.Supr., 378 A.2d 624, 628 (1977); *Ellingwood v. Wolf's Head Oil Refining Co.,* Del.Supr., 38 A.2d 743 (1944); *Holland v. National Automotive Fibres,* Del.Ch., 194 A. 124, 126 (1937). And, as to the conversion privilege, it has been said that the rights of a preferred shareholder are "least affected by rules of law and most dependent on the share contract." Buxbaum, "Preferred Stock—Law and Draftsmanship," 42 *Cal.L.Rev.* 243, 279 (1954).

■ Our duty, then, is to construe the contract governing the preferred shares. In so doing, we employ the methods used to interpret contracts generally; that is, we consider the entire instrument and attempt to reconcile all of its provisions "in order to determine the meaning intended to be given to any portion of it." *Ellingwood v. Wolf's Head Oil Refining Co., supra* at 747. More to the point, we must construe the several qualifications of the conversion privilege which are stated in Sections (c)(4)–(7) of the Certificate.

### C.

The basic conversion privilege is stated in Section (a) of the Certificate: at the option

of the holder, each share of preferred is convertible into one share of common. That is the governing norm, fixing the ratio between the classes. It is the benchmark from which the holder of a preferred share may, at a time of his choice, elect to move from that status to that of a common shareholder. The *right* of the preferred to make the choice is absolute—at least, in contract terms. And the *time* at which the choice may be made is likewise absolute. The *circumstances* under which the choice is made, or may be made, is another matter. The price which the market places upon the respective shares may well be a significant circumstance influencing a decision, to convert or to not convert at any given time. In this case, for example, Coastal had not, for some twenty years prior to 1977, paid a dividend on the common stock while the preferred had regularly received the specified dividend. Obviously, the market value of the respective shares reflected that experience. But, assuming silence on the subject in the conversion contract (as here), the preferred has no right to any particular market price ratio between the shares. However, the preferred is ordinarily given (as here) anti-dilution or anti-destruction rights in the conversion contract.

Section (c)(4) in the Coastal Certificate is such an "anti-dilution" clause. It provides for a proportionate change in the conversion ratio in the event of a stock split or a stock combination (that is, a reverse split). In each of those events, the number of outstanding shares of Coastal common would change so, in order to preserve the parity relationship, a proportionate adjustment to the conversion ratio is essential.[4] In brief, (c)(4) prohibits the common from diluting the conversion right by requiring a proportionate adjustment if the number of outstanding shares is increased (and a similar adjustment if there is a decrease resulting from a reverse split).

Section (c)(6) is directed to the same anti-dilution purpose. While (c)(4) applies to subdivisions and combinations (which enlarge or decrease the number of outstanding shares), (c)(6) is directed to a stock dividend, that is, the issuance of Coastal shares to its stockholders as a dividend. That, too, is a circumstance which, by definition, would dilute the prior parity relationship and, to prevent that, the conversion ratio is "proportionately increased" by (c)(6).

■ Since Coastal is neither splitting nor reverse-splitting its shares, nor distributing them as a dividend, (c)(4) and (6) do not directly apply to this case.

### D.

This brings us to (c)(5) which plaintiffs contend is the heart of the matter. The short of it is that unless the plaintiffs can find something in this paragraph which, directly or by implication, prohibits Coastal from distributing the Valero stock to the holders of its common, without giving its preferred a right to participate therein (now or at the time of conversion), then, under our settled law, restated only eighteen months ago in *Judah* and running back at least to 1929 in *Gaskill v. Gladys Belle Oil Co.*, Del.Ch., 146 A. 337, 339, the preferred has no such right. The Vice Chancellor found none. Nor do we.

Given the significance of (c)(5) in the dispute, we quote it again, this time omitting the references to consolidations, mergers, sales, and so on, which are not directly germane here. Thus:

"In the event that the Corporation shall be recapitalized, . . . , provision shall be made as part of the terms of such recapitalization, . . . so that any holder of . . . Preferred Stock may thereafter receive in lieu of the Common Stock otherwise issuable to him upon conversion of his . . . Preferred Stock, but at the conversion ratio stated in this Article . . . which would otherwise be applicable at the time of conversion, the same kind and amount

---

4. For example: if the Coastal common were split three for one, the number of outstanding shares would be tripled and, upon conversion thereafter, a preferred stockholder would be entitled to receive three shares of common for each share of preferred surrendered.

of securities or assets as may be distributable upon such recapitalization, . . with respect to the Common Stock of the Corporation."

After noting that the "recapitalization" has no generally accepted meaning in law or accounting, the Vice Chancellor focused on the phrase, "in lieu of," as it appears in (c)(5) and concluded that, before the Section becomes applicable, the "Common Shares of Coastal must cease to exist and something [must] be given in lieu of them." Since the Coastal shares will continue in being after the spin-off, he concluded that the plan is not a recapitalization within the meaning of the Certificate.

Plaintiffs contend that Section (c)(5) is the key to analysis of the Certificate. They say that the settlement plan constitutes a "recapitalization" of the Coastal, which triggers the adjustment called for in that section.

Relying on the significant changes which the plan will effect in Coastal's capital structure,[5] plaintiffs argue that there will be a recapitalization in fact and law.

Section (c)(5) contains what is typically considered to be "anti-destruction" language. See *Buxbaum, supra* at 287. Transactions listed therein—a merger or consolidation, for example—are the kind of events that will not merely dilute the conversion privilege by altering the number of shares of common but, rather, may destroy the conversion privilege by eliminating the stock into which a preferred share is convertible. We focus, however, on the preferred's claim of right if Coastal "shall be recapitalized."

At trial, both sides offered the testimony of experts[6] as to what "recapitalization"

means. Professor Sametz noted that there is not a precise or specific definition, but the term implies a "fundamental realignment of relationships amongst a company's securities" or a "reshuffling of the capital structure." Cf. *Helvering v. Southwest Consolidated Corp.,* 315 U.S. 194, 62 S.Ct. 546, 552, 86 L.Ed. 789 (1942).

The parties have also cited cases[7] from other jurisdictions, but we are not persuaded that such cases considered language reasonably comparable to that at issue here; so they are of little help. And the same is true of general financial terminology. The point is that we must decide the controversy under the facts in this case and, for present purposes, that means the Certificate language.

We agree with plaintiffs that the changes which the plan will bring to Coastal's financial structure are enormous. And it may be concluded that, collectively, these amount to a "reshuffling of the capital structure" under the general definition to which Professor Sametz testified. But that is not the test. The critical question concerns what is said in the contract.

Section (c)(5) provides that in the event of "recapitalization" one of the provisions shall be that a holder of preferred may "thereafter" receive—something. *When* he may receive it is clear: he may receive it "upon conversion" after the recapitalization has taken place. After that event, he may receive, not what he would have received *before* recapitalization; that was the common stock which was "otherwise issuable to him upon conversion." Certainly this clause is meaningless if the common share remains issuable to him *after* recapitalization. And so is the remainder of the paragraph which requires that the same conver-

---

5. A summary of the changes appears in the settlement plan, which we have already outlined.

6. Arnold W. Sametz, a Professor of Finance at the Graduate School of Business Administration, New York University, and a Director of Solomon Brothers Center for the Study of Financial Institutions, testified for plaintiffs. Jerome S. Katzin, managing director of the investment banking firm of Lehman Brothers,

Kuhn Loeb, Incorporated, testified for defendants.

7. See, for example, *Stephenson v. Plastics Corporation of America,* Minn.Supr., 276 Minn. 400, 150 N.W.2d 668 (1967); *United Gas Improvement Co. v. Commissioner of Internal Revenue,* 3 Cir., 142 F.2d 216, 218 (1944); *Commissioner of Internal Revenue v. Neustadt's Trust,* 2 Cir., 131 F.2d 528 (1942).

sion ratio be retained by distributing to the preferred, upon conversion, the "same kind and amount of securities or assets as may be distributable upon said recapitalization . . . with respect to the Common." The "same kind and amount" would be distributable to the common only if the common had been exchanged for something else. This was the situation the draftsman contemplated by the provision that the preferred "may receive" the "same kind and amount" of property "in lieu of the Common Stock."

■ Since the settlement plan does not include an exchange of the common and, given the added circumstances that the dividend or liquidated preference of the preferred is not threatened and that earned surplus is ample to support the distribution of the Valero shares to the common, the settlement plan does not include a recapitalization within the meaning of Section (c)(5).

### E.

We turn now to (c)(7) which, we think, is related to what is said in (c)(5) and our construction of it; (c)(7) states:

"No adjustment of the conversion ratio shall be made by reason of any declaration or payment to the holders of the Common Stock of the Corporation of a dividend or distribution payable in any property or securities other than Common Stock, any redemption of the Common Stock, any issuance of any securities convertible into Common Stock, or for any other reason, except as expressly provided herein."

This section, plainly and clearly, lists transactions which do not call for an adjustment to the conversion ratio. Thus an adjustment is not made for:

(1) a dividend payable to holders of the common in property other than Coastal common,

(2) a redemption of the common,

(3) an issuance of securities convertible into common,

(4) "any other reason."

Section (c)(7) concludes with the phrase, "except as expressly provided herein," which creates an ambiguity that must be resolved.

Plaintiffs contend that the phrase relates to all of Section (c), including (c)(5), and thus if a property dividend (the Valero stock) is regarded as a "recapitalization," the latter section controls. It is somewhat difficult to follow that argument but, as we understand it, plaintiffs contend that (c)(7) does not apply here.

In our opinion, the phrase, "except as expressly provided herein," refers to those paragraphs of Section (c) which "expressly . . . . [provide]" for a change in the conversion ratio. In so doing, the phrase does modify the preceding phrase, "any other reason" (which is all-encompassing). But the transactions referred to are those in (c)(4) and (c)(6), and thus they are the exceptions "expressly provided" for. There are no exceptions provided for in (c)(7) and, therefore, the phrase would be meaningless if it were construed as applying to (c)(7).

■ Section (c)(7) states flatly that an adjustment shall not be made in the conversion ratio in the event any of the three specified events occurs: a dividend in property other than Coastal common, a redemption of the common or the issue of securities convertible into common. And the three specifics are enlarged by the general reference to "any other reason." Given what we believe to be mandatory language ("[n]o adjustment . . . shall be made") prohibiting a change in the conversion ratio, we conclude that such a change may be made only if it is "expressly provided" in Section (c), and, as we have said, that means by the anti-dilution provisions of (c)(4) and (c)(6), i. e., by a stock split, reverse split or a stock dividend. It is only in those paragraphs that provisions are found for an *adjustment* in the conversion ratio.[8] Section (c)(5), on the other hand, is not directed merely to an adjustment in the

---

8. The adjustment called for is an increase or decrease, as the case may be, of the number of shares of common to be received for each share of preferred which is converted.

exchange ratio; it is directed toward maintaining parity between the common and the preferred after a specified event has occurred: thus a conversion after recapitalization, merger or consolidation shall be "at the conversion ratio stated in this Article." The "conversion ratio" referred to here is the parity referred to throughout the Article (i. e., the Certificate).[9]

■ But even if one were to find some inconsistency or contradiction between (c)(5) and (c)(7), then, under familiar and well-settled rules of construction, the specific language of (c)(7) (as applied to the Valero stock) controls over any general language in (c)(5) regarding recapitalization. *Stasch v. Underwater Works, Inc.*, Del. Supr., 2 Storey 397, 158 A.2d 809, 812 (1960); *Restatement of Contracts* § 236(c).

### F.

We have reviewed Sections (c)(4) through (c)(7) independently but failed to find therein any merit to the contentions which plaintiffs argue. And considering the paragraphs together, *Ellingwood v. Wolf's Head Oil Refining Co., supra,* confirms our conclusion. So viewed, the basic scheme is that parity between the common and preferred is maintained through any changes in the number of outstanding shares which are unaccompanied by other balance sheet changes: thus a stock split, reverse split or stock dividend changes only the *number of shares* outstanding without any change in corporate assets. Sections (c)(4) and (c)(6) provide for continuing parity by making the appropriate adjustment to the conversion ratio (that is, what will be given for one share of preferred) in such instance. But it appears that a reduction in *assets* by distribution to the common may be made without adjustment to that exchange basis. Thus a cash dividend is permissible under (c)(7),[10]

or other corporate assets (stock in a listed company, for example) may be distributed under that paragraph. And if the distribution of assets is in the form of a redemption of the common, that, too, is permissible. In short, dividends and other distribution of corporate assets are permissible without change in the exchange basis. Speaking generally, such distributions are the ordinary and permissible way in which the holders of common stock share in the earnings of the enterprise. In saying this, we emphasize once more that there is not a charge here that the liquidation preference or the dividend of the preferred is in any way threatened. Nor is fraud involved.

\* \* \*

■ In summary, we conclude that a distribution of the Valero stock to the holders of coastal common is permissible under Section (c)(7) and may be made without adjustment to the conversion ratio; such distribution is not a recapitalization under Section (c)(5).

### III

■ Next, plaintiffs contend that the settlement plan should have been put to a special (two-thirds) vote of the preferred shareholders as a class, as provided for in Section VII of the Certificate.[11] That section states in part:

"So long as any shares of . . . Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote or the written consent as provided by law, of the holders of at least two-thirds (⅔) of the outstanding shares of . . . Preferred Stock, voting as a class,

(a) create, authorize or issue any class or series of stock ranking either as to payment of dividends or distribution of assets prior to the . . . Preferred Stock; or

---

9. Assuming Section (c)(5) could possibly be interpreted to contemplate an adjustment of the conversion ratio, none would be appropriate under our view of these facts since we have concluded that the settlement plan here does not include a recapitalization within the meaning of Section (c)(5).

10. Mr. Katzin testified that Coastal has a substantial earned surplus to which the Valero distribution is to be charged.

11. Plaintiffs rely upon their Certificate rights, not upon any Delaware statute. Cf. 8 *Del.C.* § 242(c).

(b) change the preferences, rights or powers with respect to the . . . Preferred Stock so as to affect such stock adversely[.]"

For most purposes, the voting rights of the preferred shareholders are found in Section IV of the Certificate and, for most purposes, their rights are the same as the holders of the common. In our opinion, the special voting provisions for which plaintiffs argue are triggered only by the two events stated above. And neither of those has occurred.

Thus, shares are not to be issued under the settlement plan which would rank superior to plaintiffs' shares, either as to payment of dividends or distribution of assets. And the settlement plan will not change the preferences, rights or powers of the preferred. As we have said, the special features of the preferred stock are those fixed by the share contract and the settlement plan comports with that contract, as we have construed it. It follows that Coastal has not "change[d] the preferences, rights or powers" of the preferred shareholders and, so, the latter are not entitled to vote on the plan as a class.

### IV

Plaintiffs also argue that the settlement plan unjustly enriches the common shareholders at the expense of the preferred shareholders.

■ There is no contention that Coastal is in arrears on dividends payable to the preferred, nor is the Company in the proc-

ess of dissolution.[12] After the plan is implemented Coastal will have (according to the pro forma statements) assets of more than $2.2 billion and a net worth of $477 million.[13] But the significant fact is not what Coastal retains nor the extent of the "reshuffling." Any right of the preferred to participate in the Valero distribution must come from the Certificate.[14] Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it.

### V

■ Finally, plaintiffs challenge that part of the order of the Court of Chancery directing that they pay the cost of giving notice to the class of the pendency of this action. That order is, under Rule 23, at the discretion of the Trial Judge and plaintiffs have not shown that he abused his discretion in assigning costs to them.

\* \* \*

Affirmed.

---

12. During oral argument, in response to an inquiry by the Court, plaintiffs acknowledged that after the spin-off of Valero, the preferred would, for balance sheet purposes, be in essentially the same position as before the spin-off. We emphasize that plaintiffs do not argue that the plan is in any way fraudulent to them, nor do they say that it jeopardizes their dividend payments or liquidation preferences.

13. Coastal will hold investments in the refining and marketing of oil and gas, coal mining, chemical production. It will also have the Colorado Interstate Gas Company which operates 5,200 miles of natural gas pipeline in six States.

14. As to the Lo-Vaca system, which will be incorporated into Valero, Mr. Yarbrough, an independent Coastal director, testified at trial that Lo-Vaca was unlikely to be a material contribution to Coastal's income; thus:

"I also became convinced, and I know other directors shared this, that even if one assumed that the litigation could be won, it seemed to me very unlikely that Coastal States Gas Corporation would ever realize any material income from Lo-Vaca, that one way or another, that was going to be prevented by the super-charged, highly-politicized atmosphere in Central Texas, San Antonio and Austin, in particular."