### A90A0186. SHOFFNER v. WOODWARD et al.
(394 SE2d 921)

SOGNIER, Judge.

James P. Shoffner brought suit against Constance and M. G. Woodward to recover additional compensation allegedly due pursuant to the terms of a stock purchase agreement. The parties filed cross-motions for summary judgment, and Shoffner appeals from the judgment entered in favor of the Woodwards.

The parties agree the material facts are undisputed and the question before the court is one of contract interpretation. In 1982, appellant was engaged by Team Temporaries, Inc., the predecessor in interest to Team Services, Inc. (the "company"), to generate additional capital for the company's operations. As a result of his efforts, 300 shares of company stock were sold to appellee M. G. Woodward. Appellant received 100 shares of company stock as compensation for his services. On June 27, 1985, he and appellees executed the stock purchase agreement (the "agreement") whereby Constance Woodward, with M. G. Woodward as guarantor, agreed to purchase appellant's 100 shares in the company for $1,125 per share (the "base price"). The agreement provided that upon the issuance, sale, purchase, or redemption by the company, or sale by certain stockholders, of shares of company stock for a price in excess of the base price during a specified time period (a "qualifying sale"), appellant was to receive additional compensation calculated according to a specified formula. Sales of company stock to insiders, including appellees, were not subject to additional compensation. In addition, section 1.02 (c) of the agreement provided in pertinent part that if "there shall be any stock dividend or other distribution of capital stock or any increase or decrease in the number of outstanding shares of capital stock of the [company] *as a result of recapitalization, reorganization, merger or otherwise,* [appellant is entitled to additional compensation according to the formula] so that [he] is entitled to receive the same amount that he would have received had the [q]ualifying [s]ale taken place immediately prior to such stock distribution or increase or decrease in the number of shares of capital stock of the [company] as a result of recapitalization, reorganization, merger or other such change in the capital structure of the [company]." (Emphasis sup-

plied.) At the time the parties executed the agreement, there were 1,199 shares of company stock outstanding.

Thereafter, in April 1987, the company's shareholders (appellees and Lawrence Stumbaugh) entered into a contract (the "sale contract") to sell 1,900 shares of outstanding company stock to Hestair plc, an English corporation, at a price of $4,750,000. As a prerequisite to the sale, Hestair required that the company retire certain obligations and establish a balance of $800,000 in net working capital. Accordingly, prior to the May 1987 closing, the company sold 781 shares to the shareholders at the base price ($1,125 per share) in exchange for cash and a note, both of which were used to reduce the company's outstanding obligations and to increase its working capital. At the closing of the sale contract, Hestair received the outstanding 1,980 shares (1,199 original shares plus the 781 sold to the shareholders in April). Appellees then notified appellant that a qualifying sale had occurred and paid him additional compensation of $60,795.50 pursuant to the agreement. This amount was calculated by dividing the net purchase price of $4,635,000 (sale price less $15,000 applied to Hestair's letter of credit and $100,000 retained by the company to pay employee bonuses) by 1,980 shares.

1. Appellant maintains the sale by the company of 781 shares to appellees and Stumbaugh occurred "as a result of recapitalization, reorganization, merger or otherwise" as stated in section 1.02 (c), and thus the equitable adjustment provision in that section of the agreement should have been applied so that upon the sale to Hestair appellant would have received the amount to which he would have been entitled before the sale of the additional 781 shares.

(a) We first address his contention that the sale of the 781 shares to appellees and Stumbaugh constituted a "recapitalization" because the effect of the transaction was to change the debt/equity ratio of the company's balance sheet. Since "recapitalization" is not defined in the agreement, we must determine its meaning in the context of the parties' intention, e.g., *Rodgers v. Rodgers*, 234 Ga. 463 (216 SE2d 322) (1975), and the parties agree that section 1.02 (c) is an antidilution provision intended to protect appellant's rights to additional compensation in the event of a qualifying sale.

When interpreting contracts, we follow the rule that "[w]ords generally bear their usual and common signification; but . . . words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." OCGA § 13-2-2 (2). Although not expressly defined therein, "recapitalization" is a term used in the Georgia Business Corporation Code to refer to certain stock transactions. See OCGA §§ 14-2-1110 (5) (F), — 1112 (b) (3) (A) (iii); see also Comment to OCGA § 14-2-1004 (a) (10). Accordingly, we find recapitalization is a business finance term, and as the

agreement at issue involved the sale of stock, we will assume the term was used in that sense. Neither party has cited us to a Georgia case or statute that defines or interprets the term recapitalization, nor has our research disclosed any Georgia authority. The term is most commonly interpreted in cases concerning the applicability of 26 USC § 368, which defines certain corporate transactions that are exempt from taxation, and which includes "recapitalization" in the definition of "reorganization." Id. at (a) (1) (E). Courts applying this provision have defined recapitalization as "reshuffling of a capital structure within the framework of an existing corporation" (*Helvering v. Southwest Consolidated Corp.*, 315 U. S. 194, 202 (62 SC 546, 86 LE 789) (1942)); as "a new form of the previous participation in an enterprise, involving no change of substance in the rights and relations of the interested parties one to another or to the corporate assets" (*Bazley v. Commissioner*, 331 U. S. 737, 740 (67 SC 1489, 91 LE 1782) (1947)); as a transaction in which stockholders receive new securities "without substantially changing their original investment" (*Commissioner v. Neustadt's Trust*, 131 F2d 528, 530 (2nd Cir. 1942)); and as " '(a) an arrangement whereby the stock, bonds or other securities of a corporation are readjusted as to amount, income or priority, or (b) an agreement of all stockholders and creditors to change and increase or decrease the capitalization or debts of the corporation or both.' [Cit.]" *United Gas &c. Co. v. Commissioner*, 142 F2d 216, 218 (3rd Cir. 1944). See also 17 Fletcher, Cyclopedia of Corporations, § 3:48 (defines recapitalization as any change in the amount or type of authorized stock, including an increase or decrease in the amount of authorized shares or a change in par value of existing shares); Treas. Reg. § 1.368-2 (e) (examples of recapitalization include exchanging bonds for stock and surrendering preferred stock in exchange for no par value common stock).

Like the *Bazley* court, 331 U. S. at 741, we will not attempt an abstract definition of recapitalization, but will ascertain the meaning of the term in the context in which it is used and in accordance with the parties' intention. The purpose of the antidilution provision was to provide for an adjustment in the event there was a proportional change in the company's outstanding shares through corporate actions such as a stock split so that appellant's right to additional compensation at the time of a subsequent qualifying sale would not be diluted. See *Wood v. Coastal States Gas Corp.*, 401 A2d 932, 938 (II) (c) (Del. Supr. 1979). Accordingly, we hold the term "recapitalization" in section 1.02 (c) was intended to encompass a change in the number or character of the outstanding shares of the company unaccompanied by a change in the stockholders' existing investment. Where, however, additional investments are made by the stockholders so as to increase the economic value of the company, that constitutes a fun-

damental change in the company's capital structure—a capitalization rather than a *re*capitalization—and the antidilution provision does not apply. In the transaction at issue, while the total number of outstanding shares increased, there also was a corresponding rise in the net economic value of the company in the form of the consideration paid by appellees and Stumbaugh for the 781 shares. Thus, rather than diluting appellant's share, the transaction increased the value of the company. We agree with appellant that the debt/equity ratio of the company changed as a result, but this change occurred not because of a recapitalization of the existing investments but as a consequence of the addition of new capital to the company's balance sheet.

(b) Appellant also contends the phrase "or otherwise" in the clause at issue should be interpreted to mean *any* action that results in a "distribution of capital stock or any increase or decrease in the number of outstanding shares" as stated in section 1.02 (c). We do not agree, for that interpretation is inconsistent with the meaning of the rest of this antidilution provision, which provides for equitable adjustment only when there is a change in capital stock as a result of recapitalization, reorganization, or merger, all of which involve changes in the nature of the outstanding stock but not necessarily an increase in the net economic value of the company. Such an interpretation would be contrary to the rule that the "construction which will uphold a contract in whole and in every part is to be preferred." OCGA § 13-2-2 (4). Further, when we look to the entire contract, id., we find that whenever this phrase is repeated in section 1.02 (c), it refers to "recapitalization, reorganization, merger or other such change in the capital structure of the [company]." Favoring this more specific provision over the broader phrase "or otherwise," *Hearn v. Old Dominion Freight Lines*, 172 Ga. App. 658, 659 (1) (324 SE2d 517) (1984), we construe the phrase "or otherwise" to mean "or other such change in the capital structure" of the company similar to a recapitalization, reorganization, or merger, and thus find section 1.02 (c) was not activated by the sale of the additional 781 shares.

(c) We need not address appellant's argument that the sale of the 781 shares diluted his interest through payment of an artificially low price because we have determined that the antidilution provision does not apply to the transaction. We do note, however, that this transaction actually may have increased, rather than diluted, appellant's interest because it enhanced the economic value of the company so that Hestair was willing to pay the price it ultimately paid to purchase the company's stock.

2. Appellant's other contention concerning appellees' calculation of the additional compensation due him is that the calculation should have been made based upon the stated purchase price in the sale contract of $4,750,000, not the net price to the stockholders of $4,635,000.

He asserts the differential of $115,000 resulted from an allocation of the sale contract price to other items, not a reduction in the price paid to appellees and Stumbaugh, and that the agreement did not contemplate calculations based on a net price.

The sale contract provided that $15,000 of the total price would be withheld from the sellers and applied to the cost of Hestair's letter of credit, and that $100,000 of the total would be used to pay the bonuses of employees other than appellees and Stumbaugh who remained in the employ of the company for one year after the sale. The remaining amount of $4,635,000 was to be paid to the sellers in cash and promissory notes. There is no evidence either the bonuses or the letter of credit were existing obligations of the stockholders. It thus appears that while the total consideration paid by Hestair may have totalled $4,750,000, the stockholders received only $4,635,000.

Nonetheless, the agreement provides for the payment of additional consideration to appellant in the event "shares of the capital stock of the [company] are transferred for consideration having a value in excess of the [b]ase [p]rice," and the calculation is to be based upon the excess of the sale price per share over the base price. Given this focus on the price paid to and consideration received by the company, not by appellees, and given that there is no provision in the agreement for calculation of a net price per share or the price per share actually paid to appellees, we agree with appellant that his additional compensation should have been calculated on a sale price of $4,750,000.

*Judgment affirmed in part and reversed in part. Carley, C. J., and McMurray, P. J., concur.*

DECIDED MAY 29, 1990.

*Glass, McCullough, Sherrill & Harrold, John A. Sherrill, Susan L. Goodman*, for appellant.

*Parker, Johnson, Cook & Dunlevie, Kirk W. Watkins*, for appellees.