HOMAC, INCORPORATED, a Delaware corporation, Plaintiff and Counter-Defendant,

v.

DSA FINANCIAL CORPORATION, a Texas corporation and Tangent Corporation, a Texas corporation, Defendants and Counter-Plaintiffs.

and

DSA FINANCIAL CORPORATION, a Texas corporation and Tangent Corporation, a Texas corporation, Third Party Plaintiffs,

v.

James W. DRAPER, an individual, Kenneth A. Neal, an individual, Samuel Hechtman, an individual, James E. Brophy, an individual, Harold E. Cross, an individual, Thomas O. Mayberry, an individual, and Anthony V. Pieroni, an individual, jointly and severally, Third Party Defendants.

Civ. A. No. 87–CV–70142–DT.

United States District Court, E.D. Michigan, S.D.

March 23, 1987.

Philip J. Kessler, Justin G. Klimko, Michael J. Lavoie, Susan P. Carino, Detroit, Mich., for Homac, Inc.

Daniel F. Berry, Michael A. Nedelman, James E. Romzek, James A. Simpson, Birmingham, Mich., for DSA.

Robert Chandler, G.R. Poehner, Bruce K. Thomas, Dallas, Tex., for Tangent Corp.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

Plaintiff, Homac Incorporated, has filed a Motion for Preliminary Injunction in an effort to prevent Defendant, Tangent Corporation, from becoming a majority shareholder and exercising control in Homac. Plaintiff primarily seeks to enjoin DSA Financial Corporation from selling 797,679 shares of Homac common stock to Tangent. Homac contends that this alleged sale is invalid because it possesses the contractual right to purchase the disputed shares of DSA. Tangent and DSA vigorously contest this point.

On January 16, 1987, this Court entered a Temporary Restraining Order which, in essence, restrained the Defendants from attempting to modify or alter the status quo of Homac as of December 31, 1986. The parties, through their Stipulation, agreed to abide by the terms of the Temporary Restraining Order until such time as this Court could render a decision on the instant motion.[1]

An evidentiary hearing was conducted on March 5, 1987. Thereafter, the issues in controversy were taken under advisement. This Memorandum Opinion will, and does, incorporate the findings of fact, as well as the conclusions of law, of this Court. *Fed. R.Civ.P.* 65.

## I. FINDINGS OF FACT

### A. The Parties

Homac, a Delaware corporation with its principal place of business in Detroit, Michigan, is engaged in business activities which include the development of land, the sale of condominiums, and the rental of residential and commercial real estate.

DSA, a Texas corporation, is a subsidiary of Resource Savings and Loan Association, which is owned by Craig Hall. DSA's business includes the investment in companies with loans from Resource Savings.

Tangent, a Texas corporation with its principal place of business in Dallas, maintains a business which includes the investment in securities. Eighty percent of the outstanding capital stock of Tangent is owned by Amchase Financial Corporation, a Texas corporation. Eighty percent of the Amchase Financial capital stock is owned by Edwin T. McBirney, the President and Board Chairman of Tangent and Amchase. The remaining interest in Amchase is owned in equal amounts by two of Tangent's Vice Presidents and Directors, Jerry W. Peeples and Leo J. Niekerk.

### B. The Investment Agreement

In the Spring of 1985, Homac sought to restructure or refinance its outstanding long-term bank indebtedness. Kenneth A. Neal, President of Homac, achieved an

---

1. On February 17, 1987, this Court held Tangent in contempt for filing a declaratory judgment action in the Chancery Court for the State of Delaware which sought to effectuate changes in the Homac Board of Directors in contravention of the terms of the Temporary Restraining Order. Tangent was ordered to cease and desist all activities in the Delaware suit and to refrain from any activities which arose from a shareholder written consent document that had been filed on February 3, 1987.

agreement whereby the banks would accept $10,300,000 in full settlement of the total debt of $16,750,000 if payment could be made by June 8, 1985. Thereafter, Homac negotiated with several sources, including Resource and DSA, to raise the necessary funds. On April 24, 1985, Resource and DSA issued letters whereby (1) Resource agreed to loan $10,000,000 to Homac, and (2) DSA agreed to purchase between $2,000,000 and $3,000,000 of a new issue of Homac convertible preferred stock. After extensive detailed negotiations between DSA and Homac,[2] an agreement was reached. A draft of the Investment Agreement, which had been prepared by DSA, was presented to the Homac Board, who, on May 31, 1985, (1) authorized the creation, issuance and sale of 24,000 shares of Series B Convertible Preferred Stock to DSA, and (2) generally approved the draft of the Investment Agreement. The Investment Agreement and the loan documents were executed on June 3, 1985, and the transactions were closed on June 6, 1985.[3]

## C. The Series B Stock

Pursuant to the terms of the Investment Agreement and the Series B Stock certificate, Homac issued 24,000 shares of Series B Stock, par value $100 per share, to DSA. Under the terms of the Investment Agreement, Homac was entitled to redeem the stock in whole (but not in part) at any time prior to June 1, 1989 at a redemption price that would be equal to the sum of all of the accrued and unpaid dividends or distributions plus a price per share according to the following schedule:

| Redemption Period | Redemption Price Per Share |
|---|---|
| Prior to June 1, 1986 | $140 |
| June 1, 1986–June 1, 1987 | $196 |
| June 1, 1987–June 1, 1988 | $275 |
| June 1, 1988–June 1, 1989 | $380 |

The Investment Agreement also enabled Homac to redeem the Series B Stock with cash or its common stock or a combination thereof. If redeemed partly or wholly in common stock, the number of common shares to be issued was to be calculated by dividing the average daily market value of the common stock for the preceding ninety calendar days into the redemption price per share.

The parties also agreed that DSA could elect to convert the Series B Stock into common stock at a conversion price of $4.00 per share, or twenty-five shares of common per $100 preferred share. Thus, 600,000 shares of Homac common stock would be issued upon DSA's conversion of the Series B Stock. In the event of a call for redemption of the Series B Stock, DSA would have the right to await the close of business on the redemption date to convert such stock. If a cash redemption call was made by Homac, DSA would be able to convert its Series B Stock into common shares and, thereby, maintain an investment in Homac. In the event of a redemption with the Homac common stock, it would be advantageous for DSA to convert only if it would receive more shares upon conversion than upon redemption. Therefore, the number of shares which Homac would be required to deliver to DSA upon redemption with common stock would fluctuate according to the market price of the common stock and, if the market price remained fairly stable, would increase dramatically each year in accordance with the increase in redemption prices set forth in the above table. By contrast, the number of common shares receivable by DSA upon

2. Homac was represented at these negotiations by Neal and attorney Charles Hammond of the law firm of Donovan, Hammond, Zeigelman, Roach & Sofiroff in Detroit, Michigan. DSA was represented by attorney John Drisdale and Thomas W. Hughes of the Dallas, Texas firm of Winstead, McGuire, Secrest & Minick.

3. Testimony at the hearing by Neal indicates that Hammond, Mark Wiedelman (an associate of Craig Hall), Richard Arnold (a Vice President of DSA) and Tom Hughes (an attorney for DSA) were present during all or part of the closing. Others were present as well. Neal contends that he made certain comments about the right of first refusal clause in the Agreement at the clos-

a conversion of the Series B stock would be fixed to 600,000 shares.[4]

### D. The Investment Agreement and Homac's Right of First Refusal

The Right of First Refusal clause is contained in Section 4.3 of the Investment Agreement, which reads, in pertinent part:

In the event that [DSA] shall propose to sell, transfer or otherwise dispose of more than 100,000 shares of Common Stock or such number of shares of Series B Stock as would then be convertible into such number of shares of Common Stock other than pursuant to a transaction in which the registration rights granted to [DSA] is transferable in accordance with the provisions of Section 7.15, [DSA] shall first make an offering of such shares to [Homac] in accordance with the following provisions ...

Section 7.15 of the Investment Agreement states:

The Registration Rights granted to the Investor under this Section 7 may be transferred but only

(a) in connection with the distribution by Investor of Registrable Stock to the benefit owners (including, without limitation, to partners of a general or limited partnership, to beneficiaries of a trust or shareholders of a corporation) of the Investor; or

(b) to a transferee who shall acquire not less than 100,000 shares of Registrable Stock and provided the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee or assignee and the Registrable Stock with respect to which such Registration Rights are being assigned; and provided further, that such assignment shall be effective only if immediately following such transfer the further disposition of such Registrable Stock by the transferee or assignee is restricted under the Securities Act, such assignee or transferee agrees to

be bound by the terms of this Agreement and such assignee or transferee grants the Company a right of first refusal on substantially the same terms as provided by the investor pursuant to Section 4.3 hereof.

"Registerable Stock" is defined in Section 7.1 of the Investment as follows:

All shares of Common Stock issue or issuable upon redemption, repurchase or conversion of the Series B Stock sold pursuant to this Agreement, and all shares of Common Stock issued by the Company in respect of such shares, which have not been sold to the public, but excluding Common Stock sold by the Investor in a transaction in which its rights under Section 7 are not assigned.

A party, who possesses the registration rights to any common shares that were issued in connection with the Series B Stock (i.e., by redemption or conversion), is entitled to have those shares registered by Homac under the Securities Act of 1933 according to Article 7 of the Investment Agreement. In order to accomplish this registration, Homac would be required (1) to file a registration statement with the Securities and Exchange Commission which would disclose detailed financial and other information relating to the Company, and (2) to have such registration statement declared effective by the Commission. Registration would make the Common Stock freely transferable to another entity, such as DSA. Without such registration, transfer of the shares would be restricted by the Securities Act.

Section 7.15 governs DSA's ability to transfer the registration rights by setting forth the various requirements that must be met. Transfers of stock that comply with the provisions of Section 7.15 are exempt from the right of first refusal as stated in Section 4.3.

One other important part of the Agreement is Section 11.11 which provides that:

---

ing. However, there is no evidence that anyone heard him as will be discussed.

**4.** Testimony by Neal revealed that Homac intended to exercise its redemption right prior to June 1, 1986 in order to avoid the increase in the redemption price per share.

This Agreement sets forth the entire understanding and agreement among the parties with respect to the subject matter hereof and supersedes and replaces any prior understanding, agreement or statement (written or oral).

This section has some relevancy to the parol evidence issue raised by Homac as will be discussed.

### E. Redemption of the Series B Stock

On May 30, 1986, Homac redeemed the Series B Stock from DSA in exchange for 797,679 shares of common stock pursuant to the redemption formula set out in the Investment Agreement.

### F. The "Almost" Deal with Craig Hall

In the Fall of 1986, Neal and Hall engaged in extensive negotiations about the latter's expressed interest in acquiring control of Homac. In December of 1986, the Homac Board approved an offer from Hall which involved a two step transaction that would have eventually given him all of the Company's outstanding stock by January 4, 1988.[5] A press release, which reflected the anticipated assumption of control by Hall, was issued on December 9, 1986. However, the transaction was not completed for reasons that are in dispute. In a December 15, 1986 letter, Hall asserted that he had just been advised of Homac's delinquency in repaying its loan commitments. This, according to Hall, would result in a delay in the approval by the Securities and Exchange Commission regulatory agency. Homac believes that Hall had changed his mind and wanted to deal directly with Tangent.

### G. DSA's Proposed Transfer to Tangent

According to Edwin T. McBirney's testimony, Hall approached him between December 15 and 20, 1986 about the possibility of purchasing DSA's shares. During that same period of time, he also bought a significant number of shares from two other Homac stockholders—a Mr. Gould and a Mr. Barnes. On December 23, 1986, Richard Arnold, Vice-President of DSA, sent Neal a Transfer Notice, which incorporated DSA's intention to transfer 797,679 shares to Amchase, as required by Section 4.3. Arnold also wrote:

> Investor hereby requests that [Homac] waive its rights under Section 4.3 of the Investment Agreement to permit unencumbered closing of the proposed transaction prior to January 1987.[6]

Subsequent to his receipt of the Transfer Notice, Neal met with McBirney in Detroit on December 26, 1986 for several hours. However, there is a dispute as to the content of their conversation. Neal asserts that he unsuccessfully sought to determine the extent and nature of McBirney's future plans for Homac. On the other hand, McBirney contends that Neal made very little effort to get to know anything about his business background and intentions.

Neal also testified that he raised the issue of Homac's right of first refusal during the December 26th meeting. Additionally, he claims to have asked McBirney about his intentions regarding the minority shareholders. In response, McBirney allegedly stated that he would honor all of his legal obligations toward the minority shareholders. McBirney also contends that he first learned of the existence of a right of first refusal from his counsel during the last week of December 1986. He had hoped to complete the transaction before the end of 1987 in order to take advantage of certain tax benefits from Homac's net operating loss record.

On December 30, 1986, Neal responded to Arnold's December 23rd communication

---

**5.** Hall submitted a written proposal on November 28, 1986 under which (1) Hall Western, Inc. would merge with Homac, (2) DSA and Hall would own at least 51% of Homac's outstanding common stock, and (3) all remaining shares of Homac stock would be purchased for $4.50 per share by December 31, 1987.

**6.** Reference to this letter or to any other document does not represent a decision by this Court with regard to the use, if any, of parol evidence in connection with the meaning of the contract. In this Section, the Court is seeking to set forth the chronology of the dispute regarding the right of first refusal. The parol evidence question will be addressed in the conclusions of law section.

with a letter which stated that "[t]he Company does not waive its rights under Section 4.3 of the Investment Agreement." During a December 30, 1986 telephone conversation, Arnold then advised Neal that if Homac did not waive its first refusal right, DSA and Tangent would "wrap around it." On the following day, McBirney forwarded a notice to Neal which invoked Section 7.15(b) of the Investment Agreement, and stated that Amchase had (1) purchased DSA's shares, (2) had received DSA's registration rights, and (3) agreed to be bound by the terms of Section 7.15(b). Neal claims to have first learned that Tangent and DSA did not believe that Homac had a right of first refusal during a conversation with McBirney on January 2, 1987.[7]

On January 5, 1987, Neal, following a special meeting of his Board, informed Arnold that Homac intended to purchase DSA's shares. On the same day, Arnold sent a letter to Neal, in which he expressed his frustration with Homac's actions but acknowledged that the Company "is free to purchase the DSA shares." Homac contends that this statement clearly demonstrates that DSA acknowledged its right of first refusal covering this transfer. Defendant, DSA, contests this contention.

At the evidentiary hearing, each of the parties gave policy justifications for their interpretation of the right of first refusal provision. Neal testified that everyone, including DSA, knew that the right of first refusal was explicitly meant to apply to a transaction as in this controversy. Neal stressed that this was necessary in order to provide the Company with some modicum of control over its operation and destiny. On the other hand, Tangent and DSA representatives at the hearing noted that this transaction fell squarely within the exception to the right of first refusal. Thomas Hughes, an attorney for DSA, who helped draft the Investment Agreement, claims to

have informed Hammond, that the exception to the right of first refusal was a classic "stepping into the shoes" situation. According to Hughes, this means that DSA could sell to whomever it wanted under Section 7.15 if the buyer was willing to bind itself to the terms of the Agreement.

## H. The Written Consents

Subsequent to its attempted acquisition of shares from DSA, Tangent attempted to exercise control over Homac based upon its purported ownership of a majority of Homac's outstanding common stock, including the DSA shares. Thus, on January 9 and 14, 1987, Homac received a "Written Consent of the Holder of a Majority of the Shares of Homac Incorporated" as well as proxy forms, which were purportedly executed pursuant to Section 228(a) of the Delaware General Corporation Law from Tangent. Another Consent was received on February 3, 1987 in an attempt to revise the earlier ones.[8] These Consents attempt to accomplish the following:

(i) expand Homac's 10 member Board of Directors (due to resignations, currently consists only of 7 members) to 15 Directors;

(ii) amend Section 4 of Article II of Homac's By-Laws to provide that vacancies arising from the resignation or removal of a Director or through an increase of the number of Directors may be filled by a majority vote of all remaining Directors unless shareholders holding a majority of the outstanding voting shares request otherwise;

(iii) appoint eight individuals, including McBirney, as Directors to fill vacancies that had been created by resignations and the expansion in the size of the Board;

(iv) amend Article VI, Section 2 of Homac's By-Laws to provide that Special

---

7. Neal initially testified that he first learned of Defendants' beliefs (to wit, there was no right of first refusal) on January 5, 1987. He subsequently changed his testimony.

8. There is some dispute as to the number of shares involved. During oral argument, Homac

asserted that the proxies purportedly represented 1,436,754 shares or 51.04% of the relevant stock. Homac also claims that the proxy defects meant that the proxies only represented 1,296,604 shares or 46.06% of the stock. Tangent asserts it has 55% of the shares.

Meetings of Directors may be called by any three Directors; and

(v) amend Article VI, Section 5 of Homac's By-Laws to provide that the place of Regular or Special Meetings of the Board may be designated by the three Directors who call the meeting.

*I. The Schedule 13(d)*

On January 9, 1987, Tangent filed a statement on Schedule 13(d), which was amended on January 13, 20 and 21, 1987 and February 6, 1987 with the Securities and Exchange Commission. Homac challenges the adequacy of the Schedule.

*J. Homac's Financial Condition and the Goodtab Proposal*

Defendants have contended, and Plaintiff does not dispute, that Homac did not have adequate cash on hand to exercise its right of first refusal on January 5, 1987. Neal, while conceding that Homac could not have purchased the DSA shares at that time, contended that his Company had several financing options that would enable it to complete the purchase. These included numerous relationships with Detroit banks, as well as negotiations with a Beverly Hills, California company known as Goodtab Management Company. Evidence of these negotiations was demonstrated through letters from Robert N. Goodman, President of Goodtab, to Neal which outlined the terms of the transaction that would enable Homac to effectuate its right of first refusal. At the hearing on March 5, 1987, Homac produced a letter from Goodman to Neal, dated March 4, 1987, which detailed the terms of a proposed deal. However, the offer has neither been consummated nor accepted by the Homac Board as of this date.

There was also much general discussion about Homac's financial status. Testimony and evidence at the hearing indicated that Homac had net operating losses from 1982 to 1986, with the exception of 1985 when Homac received generous bank credits. At the close of 1986, the net operating loss was estimated to be around $21 million. Neal said that Homac's total assets were somewhere between $35–$50 million on June 1, 1986. To the extent that the following conclusions of law contain any facts, they should be considered as having been adopted as the findings of fact by this Court.

## II. CONCLUSIONS OF LAW

*A. Preliminary Injunction Standards*

The Sixth Circuit Court of Appeals has adopted the general standards for a preliminary injunction under *Fed.R.Civ.P.* 65 which require the following four factors be considered:

1. Whether the Plaintiff has shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the Plaintiff has shown irreparable injury.

3. Whether issuance of the injunction would cause substantial harm to others.

4. Whether issuance of an injunction would be in the public interest.

*See Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). However, the Sixth Circuit Court of Appeals has recently cautioned district courts not to be overly rigid about the application of these criteria. *See In re DeLorean Motor Company,* 755 F.2d 1223 (6th Cir.1985). In *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100 (6th Cir.1982) the court stated that it was appropriate for a district court to grant a preliminary injunction:

[e]ven where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued.

*Id.* at 105. This standard seems particularly appropriate in a corporate takeover case where the preliminary injunction hearing is an extremely critical stage of the legal proceedings. Once the company has been taken over, courts can rarely if ever "unscramble the eggs."

## B. The Right of First Refusal Issue

### 1. Choice of Law

Michigan conflict of law rules apply in determining the applicable law to be followed when interpreting the Investment Agreement in the instant case. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Coal Resources Inc. v. Gold and Western Industries*, 756 F.2d 443, 449 (6th Cir. 1985). According to Michigan Compiled Laws Section 440.1105(1) the parties to a transaction can specify applicable state law. *See also Liberty Mutual v. Vanderbush Sheet Co.*, 512 F.Supp. 1159 (E.D. Mich.1981). Section 11.7 of the Investment Agreement provides that "[t]his agreement shall be governed by and construed in accordance with the laws of the State of Delaware." Since the corporate laws of Delaware apply to questions of corporate governance relating to the Investment Agreement, the selection of Delaware contract law to govern other related issues is reasonable. *See, e.g. Duskin v. Pennsylvania-Central Airlines Corp.*, 167 F.2d 727, 730 (6th Cir.) *cert. denied*, 335 U.S. 829, 69 S.Ct. 56, 93 L.Ed. 382 (1948). Moreover, all of the parties agree that the law of Delaware applies to the right of first refusal issue.

### 2. Plaintiff's Position

Homac contends that their right of first refusal applies to a transaction such as DSA's attempted sale of shares to Tangent for several reasons. It says that the plain meaning of Section 4.3 indicates that any exception to the right of first refusal only applies to sales of Series B Stock, but not to sales of common stock. Homac bases this assertion on the language of exception in Section 4.3 which follows directly after a reference to Series B stock.[9] Thus, it is the position of Homac that it should be able to use its right of first refusal to block DSA's sale of common stock to Tangent.

Alternatively, Homac argues that, the language of Section 4.3 is ambiguous. Defendants view the "other than" language as modifying the beginning portion of Section 4.3 which provides that "[i]n the event that [DSA] shall propose to sell, transfer. ..." Under Defendants' theory, Section 4.3 would be interpreted to mean that any proposal to sell or transfer common stock *or* an equivalent amount of Series B stock would be subject to Homac's right of first refusal "other than" when the transaction of either kind of stock was made in accordance with Section 7.15. Thus, in Defendants' view, the exception to the right of first refusal could apply to Series B *and* common stock.

Homac submits that if this Court gave any credence to Defendants' interpretation, there would be two conflicting views of Section 4.3. Thus, the presence of such an ambiguity would justify the introduction of parol evidence regarding the intentions of the parties. This evidence, in Homac's view, would show that both parties were well aware that the right of first refusal would apply to this kind of transaction. Homac relies primarily upon (1) a statement that Neal purportedly made at the closing which set forth this interpretation, and (2) a purported acknowledgement by Arnold that Homac had a right of first refusal.

Homac acknowledges that Section 4.3 does not give it any right of first refusal regarding sales of *less* than 100,000 shares. However, Homac reasons that Defendants' interpretation would mean that the Section 7.15 "exception" to the first right of refusal would also preclude it from exercising the right when sales of *more* than 100,000 shares were made. Thus, Homac contends that its right of first refusal would be made meaningless in the controversy which is now before this Court if Defendants' view is adopted.

Homac also repeatedly argued that the fundamental reason for having a right of first refusal regarding the common stock with no exceptions is to prevent parties,

---

**9.** The exception to the right of first refusal begins with the phrase, "other than ..." in Section 4.3.

such as Tangent, from suddenly being able to seize control of the corporation. Homac contends that this danger does not exist with the Series B stock because if a party attempted to gain control of the Company by converting that amount, the purchaser would only be able to acquire a maximum of 600,000 shares. This, according to Homac, would be insufficient for purposes of control. Lastly, Homac contends the Investment Agreement should be strictly construed against DSA because it was initially drafted by DSA attorneys.

### 3. Defendants' Positions

Defendants claim that (1) the Agreement is unambiguous and (2) Homac does not possess a right of first refusal. They say that the "other than" language clearly modifies the "sell, transfer ..." language at the beginning of Section 4.3. More importantly, Defendants claim that Section 4.3 is unambiguous because it can only have one reasonable meaning; namely, that the exception to the first refusal involves both common stock *and* Series B stock.

Defendants assert that Homac's view of the contract would make that part of Section 4.3, which refers to Section 7.15, into surplusage language. They submit that Homac's position (to wit, that the Section 4.3 exception to the right of first refusal only applies to Series B stock) is meaningless because the exception requires the stock to be transferred in accordance with Section 7.15. Yet, Defendants contend that Section 7.15 speaks in terms of "Registerable Stock" which is defined in Section 7.1 to include only common stock. Thus, Defendants argue that the exception cannot be restricted to Series B Stock because Section 7.15 by definition only includes common stock.

During the oral argument, Defendants also produced their own parol evidence which, if accepted as being correct, would indicate that they clearly advised Homac of their belief that the right of first refusal would not bar a sale of common stock made pursuant to Section 7.15. They also claim that no one heard Neal make any state-ment regarding Homac's right of first refusal at the closing.

Defendants also assert that there are still many occasions—even under their broader view of exceptions to the right of first refusal—when Homac would be able to block sales of over 100,000 shares. These occasions would arise whenever the purchasing party did not agree to be bound by the requirements of Section 7.15. In such instances, the terms of the exception to the right of first refusal would not be satisfied.

In reply to Homac's contention (to wit, that the Investment Agreement should be strictly construed against DSA whose attorneys drafted the instruments), Defendants assert that (1) the Agreement's provisions, which were ultimately inserted into the Investment Agreement, were vigorously negotiated by the parties prior to the closing, and (2) Hammond examined the disputed provisions on behalf of Homac at great length prior to the execution of the contract.

Defendants also contend that Homac's interpretation completely ignores the basic purpose of the "other than" exception to the right of first refusal clause which is to allow another company to assume their same rights, privileges and responsibilities regarding the shares at issue. Finally, they contend that the right of first refusal has now expired because of Section 10.1, thereby rendering the instant dispute moot.

### 4. Discussion

The first issue that the Court must address is the appropriate scope of the evidence the Court can use to determine the meaning of this contract. The key question here is whether this contract is ambiguous. In *Nepa v. Marta*, 415 A.2d 470, 473 (Del.1980), the Delaware Supreme Court made clear that "[i]n the absence of ambiguity, there is no room for construction." Another Delaware court stated that where there is no ambiguity "[t]here is no room for interpretation or a search for the intent of the parties on the part of [the court]." *Cohn v. Crocker National Corp.*, 490 A.2d 569, 572 (Del.Ch.1985). These cases and

others indicate that, in the absence of an ambiguity, judicial inquiries into parol evidence or subsequent conduct of the parties to determine their contractual intent should not be undertaken by the Court. *See e.g. Artesian Water Co. v. State Department of Highways and Transportation*, 330 A.2d 441, 443 (Del.1974). In such unambiguous cases, the court must give the contract "[t]he force and effect which the language clearly demands ..." *Cohn, id.*

Delaware courts have held that a contract is ambiguous where it may reasonably admit to different meanings. *Lamberton v. Traveler's Indemnity Co.*, 325 A.2d 104, 106 (Del.Super.Ct.1974). One of the best explanations of what is meant by ambiguity was given in *Geahart v. Henry Disston and Sons, Inc.*, 290 F.2d 778, 784 (3d Cir.1961), where the Third Circuit Court of Appeals said:

> In determining whether or not there is an ambiguity the whole contract must be considered and not an isolated part. *Fraser Fund v. Fraser*, 1944, 350 Pa. 553, 40 A.2d 22; *Buchanan v. Swift, supra* [7th Cir.1942, 130 F.2d 483]; *Shipley v. Pittsburgh & L.E.R. Co., supra* [D.C.W.D.Pa.1949, 83 F.Supp. 722.] A contract is ambiguous if, and only if, it is reasonably or fairly susceptible of different construction; it is not ambiguous if the court can determine the meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. *Whiting Stoker Co. v. Chicago Stoker Corporation*, 7 Cir., 1948, 171 F.2d 248; *Zehnder v. Michaud, supra* [8th Cir.1944, 145 F.2d 713.] An ambiguous contract is one capable of being understood in more senses than one; an agreement obscure in meaning through indefiniteness of expression, or having a double meaning. *Whiting Stoker Co. v. Chicago Stoker Corporation, supra.* Before it can be said that

no ambiguity exists, it must be concluded that the questioned words or language are capable of one interpretation. Such a conclusion must be determined from a consideration of the entire instrument and not from a single portion thereof. *United States Trust Co. of New York v. Jones*, 1953, 414 Ill. 265, 111 N.E.2d 144. Thus, *Geahart* emphasized that ambiguous contracts must allow for more than one reasonable interpretation after a reading of the entire instrument.

Delaware courts also look to the entire contract before determining whether a particular part is ambiguous. The court in *Cohn* said that "a paragraph should not be read in isolation but must be read in the context of the entire agreement" in order for its meaning to be deducible. *Id.* Homac has also recognized that "in determining whether a contract is ambiguous, the court must first read the entire contract to ascertain its meaning." [10]

■ This Court believes that Defendants' view of Section 4.3 is correct because it is the only reasonable interpretation of the exception to the right of first refusal when based on an examination of the whole document. Indeed, the Court agrees with Defendants that Homac's view renders the exception totally nonexistent. This is clear because the Section 4.3 exception only involves transfers that are made in accordance with Section 7.15. However, Section 7.15 concerns only "Registerable Stock" which is defined in Section 7.1 as "[a]ll shares of *Common Stock* ..." (emphasis added). Homac's claim (to wit, that the exception to the right of first refusal only applies to Series B Stock) is in direct contravention of this definition which shows that Section 7.15 can only involve common stock. Interestingly, all counsel agreed at the hearing that "Registerable Stock" did not include Series B Stock. Homac conceded this point during the oral argument as did Neal while testifying.[11]

---

10. Plaintiff's Supplemental Brief at 18 (with citation of Delaware authority).

11. On the date immediately following the evidentiary hearing, Homac forwarded a letter to the Court which, in essence, retracted its earlier

position on this issue. The gist of this post-hearing argument appears to be that Section 7.1 defines "Registerable Stock" as "All shares of Common Stock issued or *issuable* upon redemption, repurchase or conversion of the Series B Stock ..." (emphasis added). Homac takes the

This litigation is similar to numerous other cases in Delaware where the courts found provisions of a contract to be unambiguous when examined in light of other provisions of a contract. In *Lamberton v. Traveler's Indemnity Co.,* 325 A.2d 104 (Del.Super.Ct.1974), the Court had to decide what "claim" meant in an insurance policy. In deciding that the work was not ambiguous, the Court said "[w]hen the insuring agreements are read in their entirety any ambiguity in the exclusionary portion of the policy upon which this case revolves is removed." 325 A.2d at 107.

In *Hudson v. D & V Mason Contractors,* 252 A.2d 166 (Del.Super.Ct.1969), the Court clarified the meaning of a paragraph of a contract which had referred to the inability of a party to construct the premises "as herein provided" by referring to another paragraph which had elaborated on those circumstances in which a seller could cancel. The Court referred to the "cardinal rule" of always reading a paragraph in context of the whole instrument. The Court, after reading the entire instrument, concluded that there was no ambiguity because "no rules of interpretation need be employed since the language of the contract appears to have clear meaning." *Id.* at 107.

The Delaware Supreme Court has also recently acknowledged "[t]he cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions." *E.I. duPont deNemours v. Shell Oil Co.,* 498 A.2d 1108, 1114 (Del. 1985) (emphasis added). Homac is well aware of the importance of this rule:

It is axiomatic under the rules of contract construction in Delaware, as in virtually all other jurisdictions, that one provision of a contract should not be read so as to render another provision meaningless. *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 937 (Del.1979); *Cheseroni v. Nationwide Mutual Insurance Co.,* 402 A.2d 1215, 1217 (Del.Super. Ct).

Plaintiff's Supplemental Brief at 23. Yet it is Homac's interpretation that would nullify a part of the contract.

The Delaware Supreme Court in *Wood* stressed the importance of considering the whole document in an "attempt to reconcile all the meanings." *Id.* In *Cheseroni,* the court stressed its obligation not to construe the contract so that terms become surplusage. These cases show that Defendants' interpretation must prevail. Otherwise, the exception to the right of first refusal in Section 4.3 would become meaningless in

---

word "issuable" to refer to common stock that is still in its unconverted and unredeemed Series B form. Homac argues that the reference to "issuable" common stock means that Series B stock could be squeezed into the definition of Registerable Stock under Section 7.15.

Homac's argument is self-contradictory. In its March 6, 1987 written communication to the Court, Homac acknowledged that:

Series B Preferred Stock was not "Registerable Stock" in the sense that DSA could have compelled Homac to register it under the Securities Act of 1933; only common stock qualified for registration at DSA's option.

Yet, this acknowledgement amounts to an admission that "Registerable Stock" does not cover Series B stock. Uncontradicted testimony at the hearing indicates that the reference to "Registerable Stock" in Section 7.1 of the Agreement applies to the stock which Homac was required to register. There was no other kind of "Registerable Stock." Only common stock fell in this category. It is, therefore, totally contradictory for Homac to say that "Registerable Stock" has some different and broader meaning in Section 7.15 than it does in Section 7.1.

The clause in question also never says that Series B stock is registerable. Section 7.1 says Common Stock that is issued pursuant to the agreement is registerable. The "issuable" language only refers to the fact that not all of the common stock, which can be registered and has transferable registration rights has been issued by Homac. It will not be issued until all of the Series B stock is converted or redeemed. Yet, the provision seeks to make clear that the issuable common stock will fall within the scope of the Agreement *once* it is issued, in that it will be registerable and the registration rights transferable. The provision *never* says that Series B stock can be registered. The Series B stock does not have transferable registration rights. Homac virtually concedes as much. Indeed, Neal admitted at deposition that there was no indication that Section 7.15(b) was limited to Series B Stock:

Q. Once again would you tell me anything in 7.15–B that relates to your statement that rights only related to Class B preferred?

A. I wouldn't expect to find that in this provision.

Neal Deposition, February 9, 1987, p. 116.

violation of this extensive Delaware precedent.

Homac contends that its own right of first refusal would become surplusage if Defendants' interpretation is accepted. This is not correct. Certainly, Plaintiff's right of first refusal would apply if a party, who acquired over 100,000 shares, did not agree to be bound by the requirements of Section 7.15(b). These requirements are not insignificant. For example, the purchasing party would have to agree to the balance of the Investment Agreement which has substantial obligations.

Moreover, the difference here is that if Homac's view is accepted, the language in Section 4.13 which established an exception to the right of first refusal ("other than . . .") would be totally unnecessary because the exception by definition could not exist. In contrast, Defendants' view would simply place a limitation on those occasions when Homac would be able to use its right of first refusal without making it surplusage language.

■ Plaintiff has also argued that the contract should be construed against DSA who drafted it. The testimony, however, indicates that the document was extensively negotiated. In the *E.I. duPont* case, the Delaware Supreme Court explained why Plaintiff's drafting argument deserves little attention:

> And, unlike the Court below, we find that the rule of contra proferentum has no application here. In finding that Shell had an unrestricted right to "have made" and to "sell," the Vice Chancellor stated that the provision prohibiting sublicensing must be construed against the drafter, DuPont. We disagree with that approach. First, we note that the rule of contra proferentum is one of last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of construction. *Schering Corp. v. Home Ins.*

*Co.*, 2d Cir., 712 F.2d 4 (1983); *Saturn Oil & Gas Co. v. Northern Natural Gas Co.*, 8th Cir., 359 F.2d 297 (1966); *Interpetrol Bermuda, Ltd. v. Lloyd's Underwriters*, S.D.N.Y., 588 F.Supp. 1199 (1984). Moreover, the justification for applying such rule pales in a situation, like the instant one, where the terms of an agreement resulted from a series of negotiations between experienced drafters. *Spatz v. Nascone*, W.D.Pa., 368 F.Supp. 352, 354 (1973). Where all parties to a contract are knowledgeable, there is no reason for imposing sanctions against the party who drafted the final provision.

*E.I. duPont*, 498 A.2d at 1114. In contrast to the contra proferentum rule, this Court is employing the "cardinal rule" of giving effect to all of the provisions within the contract. *Id.*

■ Based on the above analysis, this Court holds that the contract is not ambiguous. After examining the entire document, only Defendants' view gives any effect to the exception to the right of first refusal within Section 4.3. Plaintiff's interpretation is untenable. Therefore, this Court will not examine any parol evidence or subsequent conduct to interpret the contract.[12] Moreover, Section 11.11 of the Agreement shows that it was intended to be a completely integrated agreement. Accordingly, this Court must hold that Plaintiff has shown little or no likelihood of success regarding their alleged right of first refusal claim. DSA's December 31, 1986 sale of 797,679 shares of common stock to Tangent appears to have been properly made pursuant to Section 7.15 of the Investment Agreement. The sale, therefore, falls under the exception to the right of first refusal clause. Because Homac has little, if any, likelihood of success, the Court must deny Plaintiff's request to enjoin the sale of the shares and to enforce the right of first refusal provisions within the Investment Agreement.[13]

---

12. Thus, those exhibits which were conditionally admitted during the evidentiary hearing will not be used by this Court as evidence of the parties' intent. They are inadmissible for such purposes.

13. Because of this ruling, the Court will not rule on numerous other related issues by Defendants, such as whether Homac is entitled to specific performance of their right of first refusal and Defendants' claim that Homac's right of

This Court notes that even if it had found admissible the parol evidence which Homac had sought to introduce, the evidence was inconclusive. For example, Homac makes much of Neal's contention that he vocalized his belief that the Section 4.3 language applied only to transfers of Series B stock at the conclusion of the closing. Although Neal testified that no one objected to his statements, there is no evidence that anyone heard him. Moreover, Hughes testified that he (1) heard no such comment, and (2) would have strongly disagreed with the interpretation had Neal made his statement aloud. This Court finds Hughes' testimony to be convincing, especially in light of the care that the parties took in negotiating the Agreement. Since no one apparently heard him, Neal's statement, if made, was at best the equivalent of an unexpressed subjective intention. Such intentions simply do not bind the other party. *See e.g. Southern Pacific Transportation Co. v. United States*, 596 F.2d 461, 466, 219 Ct.Cl. 540 (1979).

Homac also relies on Arnold's December 23rd notice to Homac regarding the transfer which indicated that it had been sent pursuant to Section 4.3. Homac contends this demonstrates DSA's recognition of the right of first refusal clause, noting that DSA requested Homac to waive its rights so that an "unencumbered closing" could occur. This argument misses the central point. Everyone recognizes that Homac had a right of first refusal regarding at least certain sales of common stock over 100,000 shares. Arnold's letter simply requests that this right be waived. On December 30, 1986, Neal advised Arnold that the Board had denied his request. On December 31, 1986, Tangent informed Homac that the sale would proceed on the basis of their position that there was no right of first refusal when a sale was made under Section 7.15. Contrary to Homac's claim, Arnold's December 23rd letter does not suggest that a sale under Section 7.15 could be subject to the right of first refusal. Indeed, the letter never mentions Section 7.15. However, once Homac refused to waive its refusal right, the sale could only occur under Section 7.15. Therefore, Arnold's letter does not conflict with Defendants' position that the sales under Section 7.15 were not refusable by Homac.

Homac also claims that Hall's December 30th letter reflects his belief that it possessed a right of first refusal. But, as discussed above, there is no dispute on that issue. A fair reading of Hall's letter does not support Homac's argument. Like Arnold, Hall did not mention Section 7.15. Indeed, the letter makes clear that Hall believed the opposite of what Homac suggests. Clearly, he doubted that the existence of a right of first refusal could bar the sale under certain conditions. In his letter, Hall wrote "... Arnold informed me that you have decided not to waive the right of first refusal. *I am not certain if that will or will not hurt our ability to close the sale of our stock.*" (Emphasis added). Homac is incorrect when it suggests that Hall conceded that the sale could be blocked.

Homac's best evidence is found in Arnold's January 5, 1987 letter in which he wrote that "Homac is free to purchase the DSA Financial Shares for $4.50 a share." However, the deposition testimony of Neal indicates that he was advised on the same day by Hall that the sentence had been inserted in the letter by mistake.[14] DSA also says that Arnold was unable to complete the final revisions of the letter because of an illness, and as a result, his secretary signed the letter in his absence.

Indeed, this Court finds Hughes' testimony (to wit, that he explicitly advised Hammond during the negotiations that the "other than ..." exception to the right of first refusal clause was necessary so that DSA could get out as long as someone stepped into its shoes) to be persuasive. This testimony is uncontradicted. Thus, the parol evidence of the parties' intention is at best inconclusive regarding the exception to the right of first refusal. However, because

---

first refusal expired under Section 10.1. This Court does, however, find Defendants' contention that the dispute is moot to be meritless.

**14.** Neal Deposition February 10, 1987, p. 265.

Homac's interpretation would render a portion of the document ineffectual, this Court adopts Defendants' position on this issue.

## C. The Written Consents

As discussed in the findings of fact, Tangent filed written consents pursuant to 8 Del.C. § 228 in an effort to effectuate changes in the Board of Directors, amend the bylaws, and authorize the calling of a Special Meeting. Homac seeks to enjoin Tangent from carrying out these actions, claiming that the consents are invalid in several ways.

First, Homac alleges that 8 Del.C. § 228 permits actions to be taken by written consent only if the consents are delivered by holders with not less than the minimum number of votes that would be required to approve such action at a meeting at which all shareholders who were entitled to vote were present and voted. 8 Del.C. § 216 provides that a majority consent is needed for shareholder action, unless provided otherwise in the Certificate of Incorporation or bylaws. Thus, these sections require that the shareholder written consents be based upon more than fifty percent of the outstanding common stock.

Tangent submitted its first and second written consents based on its ownership and proxies for 1,436,754 shares. During the evidentiary hearing, Homac claimed that this represented 51.04% of the shares. On the basis of this representation, it appears that there are approximately 2,814,957 shares of voting stock. Thus, a majority would require a minimum of 1,407,479 shares. However, Homac contends that 140,150 of the proxies are invalid because they (1) do not represent recorded shares or (2) represent more shares than Defendants actually possess.

Homac's complaint appears to be justified. However, a third consent has also been filed. This Court held Tangent in contempt for seeking to effectuate changes in the Board of Directors through the third consent in violation of the Temporary Restraining Order which had been previously issued by this Court.[15] Nevertheless, the validity of this Third Consent must now be considered.

Homac does not contend that the Third Consent lacks a majority. Indeed, the Third Consent purports to have proxies which represent 1,476,004 shares. The Third Consent adds stock certificates to the evidence which support Defendants' contention that it has a majority.[16] These certificates, when combined with DSA's shares, give Tangent more than a majority.

■ Homac next claims that the shareholders cannot increase the number of directors without amending the bylaws. The bylaws provide:

> The Board of Directors shall be not less than five (5) nor more than fifteen (15); all of whom shall be at least twenty-one (21) years of age. The number of Directors comprising the Board of Directors within the foregoing maximum and minimum limitations *may* be fixed and/or changed from time to time by resolution of the Board.

Article 2, Section 7 (emphasis added). The use of the term "may" strongly suggests that the clause is not intended to divest shareholders of their inherent powers to exercise their authority.

In *Campbell v. Loew's, Inc.*, 36 Del.Ch. 563, 134 A.2d 852, 857 (1957), the Court stated:

> [i]t would take strong bylaw language to warrant the conclusion that those adopting the bylaws intended to prohibit the stockholders from filling new directorships between annual meetings.

No such strong bylaw language exists here. Moreover, in *Moon v. Moon Motor Car Co.*, 17 Del.Ch. 176, 151 A. 298, 302 (1930), the Court said that "[i]f the corporation, in the judgment of its majority owners ought to have a larger board of directors ...," it would not have to delay undertaking appropriate action. This reasoning is certainly relevant here. Moreover, numerous cases in Delaware have emphasized that the shareholders possess the inherent

---

**15.** See f. 1, *supra.*

**16.** See Tangent's Hearing Exhibit 9.

power to fill vacancies. *Id.* The cases usually seek to read the bylaws in such a way to avoid conflict with shareholder actions. Such a reading makes sense here. The bylaws do not suggest that the shareholders cannot act. Thus, Tangent could expand the Board under 8 Del. § 228, by shareholder resolution.

■ Next, Homac contends that the shareholders cannot elect new directors through a shareholder resolution or by an amendment of the bylaws because such an action would violate the Certificate of Incorporation which reads:

Any vacancy on the Board of Directors whether arising through death, resignation or removal of a director or through an increase of the number of directors of any class *shall* be filled by a majority vote of all the remaining directors.

¶ 5B, Certificate of Incorporation (emphasis added). Homac argues "shall" means that only the Board can fill the new positions.

Homac is correct. Homac has cited two cases, both of which are apposite to this issue. In *Prickett v. American Steel and Pump Corp.*, 253 A.2d 86 (Del.Ch.1969), the Delaware Supreme Court held that an amendment to the bylaws, which provided for one year terms for the board of directors, was in conflict with the Certificate of Incorporation that required staggered terms. The bylaw was declared to be a nullity.

Even more on point, in *Essential Enterprises Corporation v. Automatic Steel Products, Inc.*, 39 Del.Ch. 93, 159 A.2d 288 (Del.Ch.1960), the court found that a bylaw, which authorized the removal of directors without cause, was inconsistent with the Certificate of Incorporation. The Certificate of Incorporation had a provision which indicated that the directors "shall" serve staggered terms which would expire at designated intervals. However, the bylaws allowed the removal of a director at any time. The Court struck down the bylaw because the "any time" provision could result in the removal of the director prior to expiration of his/her term of office.

This case has similar "shall" language within the Certificate. Only the Board can fill these vacancies. Finally, it should be noted that *Essential Enterprises* expressed the belief that every effort should be made to reconcile the two corporate instruments, especially when the provisions were "enacted at the same time" (unlike our case). Significantly, that court did make the effort and still found a conflict.

Defendant Tangent's cases are distinguishable. In *Burr v. Burr Corporation*, 291 A.2d 409 (Del.Ch.1972), the court held that an amendment to the bylaws which permitted shareholders to fill newly created directorships did not conflict with a Certificate provision which required the directors to be elected by the shareholders at the annual meeting. The Court held that the Certificate never contemplated the problems of the need for special elections. Thus, there was no conflict.

Here, the Certificate does contemplate situations where vacancies shall be filled by the Board whenever there is "an increase in the number of directors of any class." Such an increase is embodied in the consents. Thus, the Board must fill the positions because the Certificate contemplated this issue.

*DiEleuterio v. Cavaliers of Delaware, Inc.*, Del.Ch., C.A. No. 8801, slip op. at 15 (Feb. 9, 1987) [Available on WESTLAW, DE–CS database], which has been relied upon by Defendants, is also distinguishable. In that case, the Court concluded that a provision in the bylaws was not inconsistent with the actions of a shareholder's written consent to fill newly created directorships. It held that the bylaw in question did not cover newly created directors' positions, even though the provision said that "[i]f the office of any director becomes vacant by reason of death, resignation, disqualification, removal or other cause ...," the Board shall fill the vacancy by majority vote. *See* slip op. at 16. The Court recited the long history in Delaware of a distinction between "vacancies" and "newly created directorships." The Court concluded that if the drafters had meant to have the directors fill new positions, they would have inserted the appropriate language into the bylaws. But

since the provision only referred to vacancies, it did not require the directors to fill newly created directorships. Shareholders could do so.

In contrast, the provision in this case provides, in pertinent part, that "any vacancy" on the Board shall be filled by a majority of the Board even if the vacancy comes from "an increase in the number of directors of any class." In effect, this provision says that the filling of newly created directorships is the filling of a vacancy under this Certificate. Thus, the proposed amendment to the bylaws, which would allow shareholders to fill the positions, as well as the shareholder resolution are both invalid because each of these corporate instruments conflict with the Certificate of Incorporation. As a consequence, Homac has shown a strong likelihood of succeeding on the merits regarding this issue.

Irreparable harm will result if the new director elections are not enjoined. Testimony during the evidentiary hearing revealed that the current employment relationship between Homac and Neal would be terminated when and if control of the company shifted to McBirney. Under the circumstances of this case, and after listening to the several witnesses who testified during the evidentiary hearing, it is quite evident that once control over Homac was transferred, (1) the current Board members would soon be removed from office, and (2) definitive changes in the operation of the business would occur. These changes would be irreparable once the authority to control the company had shifted. The Court could not necessarily remedy such changes at a later time.

The public interest favors preventing illegal Board elections, especially when the effect results in, or is likely to result in, a change in corporate control. The balance of hardships also weighs in favor of Homac because Tangent's actions would, under the very worst scenario, merely delay its effort to acquire the control of Homac. Thus, any election of new directors through the means, which have been suggested in the written consents, must be preliminarily enjoined.

## D. The Schedule 13(d) Issue

Homac contends that Tangent has filed misleading Schedule 13(d) forms and, therefore, has not satisfactorily complied with 15 U.S.C. § 78m(d). The general purpose of the Schedule filing requirement is to put investors on notice as to the intentions of those persons who purchase more than five percent of a company's shares. Homac contends that the Schedule 13(d) form contains a number of material omissions, in that it:

(1) fails to describe the effect of the right of first refusal in a meaningful way.

(2) contains inconsistent and incomplete statements regarding Tangent's intentions toward management and the business affairs of Homac.

(3) contains vague, sketchy, and incomplete information regarding Tangent's future plans for Homac.

(4) has not stated the source of Tangent's "cash on hand," and

(5) discloses a purchase of 2,600 shares of Homac common stock for $4.50 per share on January 9, 1987, by Tangent but it fails to give any details about the transaction.

As a preliminary matter, Tangent argues that there is no private right of action under 15 U.S.C. § 78m(d), citing *Leff v. CIP Corporation,* 540 F.Supp. 857 (S.D.Ohio 1982). Yet, it appears that every circuit court of appeals, which has ruled upon this question, has concluded that such a private right does exist. *See e.g. Florida Commercial Banks v. Culverhouse,* 772 F.2d 1513 (11th Cir.1985); *Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1224 (4th Cir. 1980); *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240, 248 (8th Cir.1979); *General Aircraft Corp. v. Lampert,* 556 F.2d 90, 97 (1st Cir.1977). Moreover, two district courts in this circuit have also disagreed with *Leff. See Hannah Mining Company v. Norcen Energy Resources Ltd.,* 574 F.Supp. 1172 (S.D.Ohio 1982); *Kirsch Co. v. Bliss and Laughlin Ind., Inc.,* 495 F.Supp. 488, 491–92 (W.D. Mich.1980). *Hannah* was cited by the

Sixth Circuit Court of Appeals with approval in *Howard v. Pierce,* 738 F.2d 722, 729 (6th Cir.1984).

■ A private right of action exists here because the issuer of the stock is the only party who can effectively police the accuracy of the filing. *See GAF Corp. v. Milstein,* 453 F.2d 709, 721 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). In *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981), the Sixth Circuit Court of Appeals found an implied private right of action under Section 14(e)—a part of the "Williams Act" just like Section 13(d). The rationale in *Mobil* strongly suggests that the Sixth Circuit would find a private right of action under Section 13(d), especially where injunctive relief is sought.

In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court set forth four inquiries that are to be employed when attempting to determine if an implied private right of action does, or does not, exist; namely, (1) who are the intended beneficiaries of the statute; (2) what is the intent of the legislature, if deducible; (3) would such an implied right be consistent with the overall legislative scheme; and (4) whether state law provides a remedy. This Court agrees with the reasoning in *Hannah* and concludes that Homac satisfies the *Cort* standards. It is especially clear that the investing public is the primary beneficiary of the disclosure provision and that its interests would be severely harmed if there was no private right of action by a target company. The Eleventh Circuit in *Florida Commercial Banks* also dealt effectively with the legislative history argument. Accordingly, this Court determines that Homac does have standing.

Each of Homac's objections must now be addressed to ascertain the adequacy of the Schedule 13(d). With regard to its contention (to wit, Tangent has not said enough about the right of first refusal), Item 5 of the Second Amended Schedule 13(d) states that Homac had filed a Complaint, which charged that (1) "DSA's transfer of 797,679 shares of the Common Stock to Tangent on December 31, 1986 violated a right of first refusal previously granted by DSA to the Corporation," and (2) "Tangent deliberately interfered with that contractual right of first refusal." Moreover, Tangent has attached a copy of the Complaint to the schedule. This Court believes that any further references to the right of first refusal are unnecessary.

Homac's concern about funding sources is not valid. The statute makes clear that it is important for the purchaser to reveal the sources of any loans which were necessary in order to make the transaction possible. Presumably, Tangent did not borrow any money to make this transaction. Thus, its funding discussion is adequate. Moreover, there has been no suggestion by Homac that Tangent did, in fact, borrow funds in order to consummate the transaction. Additionally, Homac's Complaint regarding the acquisition of 2,600 shares is simply not enough of a significant issue to be a material omission. In addition, this small transaction has been clarified.

■ Homac does, however, raise some serious questions about whether Tangent has complied with the purpose requirement. Item 4 of the Schedule says:

Tangent believes that shares of the Common Stock represent an attractive investment for Tangent at current market prices. Consequently, the acquisitions of the shares of Common Stock to which this statement relates have been made for investment, but with the intention that Tangent will continuously evaluate the business, financial condition and prospects of the Corporation, and conditions in the economy and the industries in which the Corporation is engaged, with a view toward determining whether to hold, decrease or add to Tangent's investment in shares of the Common Stock.

This statement of purpose—at best—lacks clarity or—at worst—is evasive. It is clear that the purpose of Tangent is corporate control—not merely investment. At a minimum, Homac has shown likelihood of success on this issue. The investing public has a right to the filing of a truthful pur-

pose statement. Innumerable courts have held that where the Schedule 13(d) only says "investment" is the purpose—when control is really the issue—that form contains a material omission. *See Dan River,* 624 F.2d at 1224; *Chromalloy American,* 611 F.2d at 246; *Hannah Mining Company,* 574 F.Supp. at 1201; *Kirsch,* 495 F.Supp. at 500.

Tangent argues that its true intentions are obvious from its references to the filing of certain written consent forms. Such an argument might be persuasive if the standard of notice pleadings, as required by the Federal Rules of Civil Procedure, had been adopted by the Congress for use in securities matters. However, this Court is determining whether a form filed under the *Williams Act* is truthful. Tangent must fully and completely state its purpose which, among other things, is to gain control over Homac. *Dan River* noted that it was inconceivable to assume that the "takeover" purpose had not fully formed prior to, or at the time, of the purported "investment."

■ Much evidence exists that Tangent also intends to utilize Homac's net operating losses for tax shelter purposes. No mention of this was made in the purpose statement. Moreover, McBirney revealed in his testimony that Neal will likely be terminated. This information was not in the Schedule. Accordingly, Tangent is preliminarily enjoined from acquiring and/or attempting to acquire any additional shares of Homac until such time as it has filed an amended 13(d) in accordance with the directives of this Court. An injunction is the only effective mechanism in which to solve the irreparable harm that has been inflicted upon a deceived investing public. *See e.g. Indiana National Corporation v. Rich,* 712 F.2d 1180, 1185 (7th Cir.1983); *General Aircraft Corp.,* 556 F.2d at 96–97.

■ Homac also seeks to preclude Tangent from exercising any voting power which it may have derived from those shares which were acquired when an allegedly invalid 13(d) form was on file. This request must be denied. DSA would have traded the stocks to Tangent even with a correct 13(d) because it had full knowledge of the underlying facts and circumstances about which Homac has complained. In *Gearhart Industries v. Smith International,* 741 F.2d 707, 717 (5th Cir.1984), the Fifth Circuit Court of Appeals said:

> We find it difficult to believe that GE would not have sold its Gearhart shares if Smith had filed a Schedule 13d disclosing its intent to gain control of Gearhart.

Thus, a "sterilization" of the present voting rights would not be justified.

### E. Tortious Interference with Business

There is no evidence that Tangent tortiously interfered with the Agreement between DSA and Homac regarding the right of first refusal. Specifically, the right did not cover the kind of transfer that occurred here. Thus, Homac is not entitled to injunctive relief on this issue.

### F. Conclusion

Accordingly, Homac's Motion for Preliminary Injunction is granted, in part, and denied, in part. Plaintiff shall submit a proposed order which shall be consistent with the terms and conditions which have been set forth in this Memorandum Opinion and Order.

IT IS SO ORDERED.